07-3694-cv
A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

--------

August Term, 2008

(Argued: December 3, 2008          Decided: January 16, 2009)

Docket No. 07-3694-cv

----------------------------------------------------------------X

A.C. and M.C., on behalf of M.C.,

Plaintiffs-Appellees,

- v. -

BOARD OF EDUCATION OF THE CHAPPAQUA CENTRAL SCHOOL DISTRICT,

Defendant-Appellant.[*]

----------------------------------------------------------------X

Before:   JACOBS, Chief Judge, McLAUGHLIN and B.D. PARKER, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Brieant, J.) granting summary judgment to Plaintiffs-Appellees.

REVERSED and REMANDED.

GARY S. MAYERSON, Mayerson & Associates, New York, NY, for Plaintiffs-Appellees.

MARK C. RUSHFIELD, Shaw, Perelson, May & Lambert, LLP, for Defendant-Appellant.

---

[*] The Clerk of the Court is directed to amend the official caption as set forth above.

McLAUGHLIN, Circuit Judge:

The Board of Education of the Chappaqua Central School District ("Chappaqua") appeals from a grant of summary judgment to Plaintiffs A.C. and M.C. by the United States District Court for the Southern District of New York (Brieant, J.). A.C. and M.C. sued under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400 et seq., seeking reimbursement for their learning-disabled child's private-school tuition.

Dismissing Chappaqua's proposed plan for special-education services for M.C.'s fifth-grade year, the parents declined to send their son M.C. to a public middle school in 2004-2005. They instead enrolled M.C. in the private Eagle Hill School and requested an impartial due process hearing under the IDEA to obtain tuition reimbursement from Chappaqua. See 20 U.S.C. § 1415(f). Although an Impartial Hearing Officer ("IHO") granted their claim, a State Review Officer ("SRO") found that M.C.'s parents were not entitled to reimbursement. The parents then pursued their claim in the United States District Court for the Southern District of New York. The district court agreed with the parents and held that Chappaqua had violated both the procedural and substantive requirements of the IDEA. Accordingly, it granted summary judgment to the parents and

2

awarded them tuition reimbursement, as well as attorneys' fees and costs.

We reverse.

**BACKGROUND**

M.C. attended pre-school through fourth grade in Chappaqua public schools. During this period, he was diagnosed with multiple disabilities, including Pervasive Developmental Disorder and Autism. As a disabled child, M.C. was entitled under the IDEA to a "free appropriate public education" administered by Chappaqua according to an "Individualized Education Program" ("IEP"). See 20 U.S.C. §§ 1412(a)(1)(A) & 1414(d).

During the 2003-2004 school year, M.C. attended a "co-taught" fourth-grade class at Roaring Brook Elementary School. In this class, M.C. was taught alongside non-disabled students, with support provided by a special-education teacher for part of the day and by a program assistant for the rest of the day. Because M.C. had difficulty focusing, Chappaqua also provided him with a personal aide, who would sit near him and keep his attention on his work through the use of prompts and cues. Occasionally the aide would bring M.C. to the school psychologist when he engaged in out-of-context "tangential" or "fantasy" speech, which involved the repetition of lines from television programs or incoherent storytelling. Chappaqua also provided

3

M.C. with additional math and reading instruction, occupational and speech therapy, and summer programs.

Between March and July 2004, Chappaqua's Committee on Special Education (the "Committee") met several times to discuss M.C.'s progress and formulate an IEP for M.C.'s fifth-grade year in 2004-2005. M.C.'s parents requested that Chappaqua consider placing M.C. in the Eagle Hill School, a private school for disabled children. The Committee declined to do so, and produced an IEP providing for co-taught classes at a public middle school. The IEP also provided for meetings with M.C.'s parents every four to six weeks where M.C.'s progress, including the level of prompting required, was to be discussed. Other programs included additional academic instruction; occupational and speech therapy; psychiatric and psychological services; and summer programs. The IEP noted that M.C. required prompting to maintain focus, but stressed the importance of developing M.C.'s independence in applying reading and math skills and following classroom routines. Though M.C. would only use a private bathroom at school, he no longer required prompting and an escort as had previously been necessary. The IEP noted M.C.'s tangential speech, and that his "[b]ehavior seriously interferes with instruction due to frequent tuning out and inattention. An additional adult such as a program assistant is needed."

4

Although not explicitly stated in the IEP, a personal aide would again have been provided.

In August 2004, M.C.'s parents informed the Committee that they did not accept the 2004-2005 IEP and would enroll M.C. at Eagle Hill. They requested an administrative hearing to obtain reimbursement from Chappaqua for the cost of Eagle Hill. They contended that Chappaqua failed to offer a free appropriate public education by, among other things, not providing for a functional behavioral assessment ("FBA") of M.C. An FBA is "the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment." 8 N.Y.C.R.R. § 200.1(r).

Between March and July of 2005, an IHO conducted an administrative hearing. The evidence at the hearing included witness testimony and reports concerning evaluations of M.C. A neuropsychologist retained by the parents reported in January 2004 that M.C. would continue to require an aide if he were to attend a public middle school. Reports by Chappaqua staff in Spring 2004 stressed the need for prompting to maintain M.C.'s focus. Both M.C.'s speech pathologist and occupational therapist agreed that M.C. had made progress. A June 2004 progress report indicated that M.C. had mastered 37 of 41 objectives set forth in his 2003-2004 IEP, including the goal of independently following

5

classroom routines.  An observation report indicated that M.C. "required 1:1 support for all observed activities."

Chappaqua's Director of Special Education and the school psychologist testified that the personal aide and prompting had successfully addressed M.C.'s inattentive behavior. Psychological and psychiatric services were recommended to assess M.C.'s tangential and fantasy speech.  The psychologist testified that incidents of this speech requiring his involvement decreased over the course of the 2003-2004 school year, and that M.C. had "improved tremendously in terms of his ability just to be part of the social environment."  The Director testified that M.C. had learned to recognize and alleviate distractions on his own by asking his classmates to stop making noise.  Both the Director of Special Education and the school psychologist testified that an FBA was unnecessary.

M.C.'s speech pathologist testified that M.C.'s tangential speech was "minimal," and when it occurred she was able to successfully refocus M.C. to communicate meaningfully.  M.C.'s special-education teacher testified that she was able to effectively educate M.C. with prompting and cuing, and identified areas where prompting was decreased when it was no longer necessary.  M.C.'s general-education teacher testified that M.C.

had progressed in the curriculum and in social interactions during the 2003-2004 school year.

District-wide special education teacher Kathy Rowland testified that the school psychologist and M.C.'s general-education teacher nodded their heads in agreement when M.C.'s mother stated at a March 2004 Committee meeting that she thought M.C. had not made progress at home. When asked whether an FBA is warranted for a student whose behavior seriously interferes with instruction, Rowland initially responded that "there [are] many factors," but when the question was asked again, stated "I can't say no, so I would have to say yes." However, she also testified that she did not believe an FBA was required for M.C.

After the hearing, the IHO ruled in favor of M.C.'s parents, finding that Chappaqua erred in failing to conduct an FBA, and that the personal aide served as a "crutch or palliative measure" that hindered the development of M.C.'s independence. The IHO further found that Eagle Hill was an appropriate placement, and ordered Chappaqua to reimburse the parents for the cost of Eagle Hill in 2004-2005.

Chappaqua appealed to an SRO. The SRO reversed, finding that Chappaqua adequately assessed M.C.'s behavior and produced an IEP that was reasonably calculated to enable M.C. to receive educational benefits in the least restrictive environment. Thus,

the "decision not to conduct an FBA did not rise to the level of denying the student a [free appropriate public education]." The SRO also noted ways in which the 2004-2005 IEP addressed M.C.'s need to develop independence.

The parents pursued their claim in the district court, which granted them summary judgment on the administrative record. The district court found that: (1) Chappaqua's failure to conduct an FBA was a procedural violation of the IDEA that denied M.C. a free appropriate public education; (2) the provision of a personal aide and a private bathroom to M.C. made the IEP substantively inappropriate because it promoted "learned helplessness" and not independence; and (3) Eagle Hill was an appropriate placement for M.C. The district court awarded tuition reimbursement and attorneys' fees and costs to M.C.'s parents.

Chappaqua now appeals.

**DISCUSSION**

We review de novo the district court's grant of summary judgment in an IDEA case. Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005). Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a "pragmatic procedural mechanism" for reviewing administrative decisions. Lillbask ex rel. Mauclaire v. Conn.

8

Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted).

"[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (internal quotation marks omitted). While the district court must base its decision "on the preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(C)(iii), it "must give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy,'" Gagliardo, 489 F.3d at 113 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 208 (1982)). Thus, district courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

The deference paid to administrative proceedings is particularly warranted where, as here, the district court's decision was based solely on the administrative record. Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 367 (2d Cir. 2006), cert. denied, 128 S.Ct. 436 (2007). If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's

9

decision "may be afforded diminished weight." Gagliardo, 489 F.3d at 113 n.2. We "defer to the final decision of the state authorities," even where "the reviewing authority disagrees with the hearing officer." Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist., 736 F.2d 873, 877 (1984).

To receive federal funding under the IDEA, states are required to provide disabled children with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). Parents who believe that the state has failed to provide such an education "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." Gagliardo, 489 F.3d at 111.

To determine whether parents are entitled to tuition reimbursement, we engage in a three-step process. Cerra, 427 F.3d at 192. First, we examine whether the state has complied with the procedures set forth in the IDEA. Id. Second, we consider whether the proposed IEP is substantively appropriate in that it is "'reasonably calculated to enable the child to receive educational benefits.'" Id. (quoting Rowley, 458 U.S. at 206-07). Only if the IEP is procedurally or substantively deficient do we reach the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs. Id. In fashioning relief, "'equitable considerations [relating to the

reasonableness of the action taken by the parents] are relevant.'" Frank G., 459 F.3d at 363-64 (alteration in original) (quoting Sch. Comm. of Burlington v. Dep't of Educ. of Massachusetts, 471 U.S. 359, 374 (1985)). As the party commencing the administrative review, the parents bear the burden of persuasion as to the inappropriateness of Chappaqua's IEP and the appropriateness of the private placement. Gagliardo, 489 F.3d at 112.

I.   Procedural Compliance

The initial procedural inquiry in an IDEA case "is no mere formality," as "'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'" Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998) (quoting Rowley, 458 U.S. at 206). "[H]owever, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003).

Here, the district court found that the failure to conduct an FBA in accordance with a N.Y. State regulation was a procedural violation of the IDEA that deprived M.C. of a free appropriate public education. We disagree. We conclude that the

11

failure to conduct an FBA here did not render the 2004-2005 IEP legally inadequate.

M.C.'s parents contend that Chappaqua was required by state regulation to perform an FBA of M.C. but did not do so.[1] Assuming such a violation may have occurred, the violation of such a regulation does not compel the conclusion that the 2004-2005 IEP was legally inadequate. The IDEA requires that, in developing an IEP for "a child whose behavior impedes the child's learning," the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). As the SRO found, Chappaqua satisfied this requirement, and its decision not to also conduct an FBA did not rise to the level of denying M.C. a free appropriate public education.

The 2004-2005 IEP provided for strategies to address M.C.'s behavior. The IEP noted M.C.'s attention problems and the need for a personal aide and prompting to maintain M.C.'s focus during class. Chappaqua's experts testified that these strategies had

---

[1] The IDEA "incorporates some but not all state law concerning special education." Bay Shore Union Free Sch. Dist. v. Kain ex rel. Kain, 485 F.3d 730, 734 (2d Cir. 2007). The state regulation relied upon by the district court requires a school district to conduct an FBA as part of its initial evaluation "for a student whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 N.Y.C.R.R. § 200.4(b)(1)(v).

proven effective. The IEP provided for psychiatric and psychological services to assess M.C.'s tangential and fantasy speech, which had declined in frequency over the 2003-2004 school year and which M.C.'s speech pathologist testified was "minimal." The Director of Special Education and the school psychologist testified that an FBA of M.C. was unnecessary. Although district-wide special-education teacher Rowland testified that an FBA is warranted for a student whose behavior seriously interferes with instruction, she also testified that "there [are] many factors" involved in determining whether to perform an FBA, and she did not believe an FBA of M.C. was warranted.

The preponderance of the evidence supports the SRO's decision that the IEP adequately addressed M.C.'s behavior, and the sufficiency of Chappaqua's strategies for dealing with this behavior "is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." Grim, 346 F.3d at 382. Thus, the failure to perform an FBA of M.C. did not render the IEP legally inadequate.

II. Substantive Adequacy

"[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." Cerra,

13

427 F.3d at 195 (internal quotation marks omitted).  School districts are not required to furnish "every special service necessary to maximize each handicapped child's potential." Rowley, 458 U.S. at 199.  Moreover, there is "a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." Walczak, 142 F.3d at 122 (internal quotation marks omitted).

The district court found that M.C.'s 2004-2005 IEP was substantively deficient because it promoted "learned helplessness" and not independence.  Chappaqua argues, however, that the district court failed to accord appropriate deference to the SRO's decision that the IEP adequately addressed M.C.'s independence.  We agree with Chappaqua.

"Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."  Cerra, 427 F.3d at 195.  Here, the SRO identified ways in which Chappaqua developed M.C.'s independence, for example, by decreasing the level of prompting where it was no longer needed.  The IEP also provided for team meetings with the parents every four to six weeks to discuss M.C.'s progress, including the level of prompting required, and stressed independence in the following of daily routines and the

14

application of reading and math skills.

M.C. also made progress toward independence in co-taught classes during the 2003-2004 year. The June 2004 progress report indicated that he had mastered the goal of independently following classroom routines. The Director of Special Education testified that M.C. had learned to recognize and alleviate distractions on his own by asking his classmates to stop making noise. And M.C. no longer needed prompting and an escort to use the bathroom. Although there was testimony that the school psychologist and M.C.'s general-education teacher nodded their heads in agreement when M.C.'s mother expressed concern in March 2004 that he was not making progress, it is by no means clear that they agreed with her concern, given that they both testified to M.C.'s progress over the 2003-2004 school year.

We therefore defer to the SRO's finding that the IEP adequately addressed the need for M.C. to develop independence, and thus was not substantively deficient under the IDEA. See Karl, 736 F.2d at 877.

Because we find that M.C.'s 2004-2005 IEP was neither procedurally flawed nor substantively deficient, we need not reach the issues whether the private placement at Eagle Hill was appropriate, see Cerra, 427 F.3d at 192, or whether equitable considerations affect relief, see Frank G., 459 F.3d at 363-64.

15

**CONCLUSION**

For the foregoing reasons, we REVERSE the judgment and REMAND to the district court with instructions to enter judgment in Chappaqua's favor.