C.T. and T.T. on behalf of their son, M.T., Plaintiffs,

v.

CROTON–HARMON UNION FREE SCHOOL DISTRICT, Defendant.

No. 10–cv–1624.

United States District Court, S.D. New York.

July 18, 2011.

Neal Howard Rosenberg, Law Office of Neal Rosenberg, Stewart Lee Karlin, Attorney–at–Law, New York, NY, for Plaintiffs.

Stephanie Lynn Burns, Keane & Beane, White Plains, NY, for Defendant.

### *Memorandum and Order*

BARBARA S. JONES, District Judge.

Plaintiffs C.T. and T.T. (the "Parents") bring this action on behalf of their minor son, M.T., under the federal Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. (the "IDEA"), against Defendant, the Croton–Harmon Union Free School District (the "District"). Plaintiffs seek review of the November 3, 2009 administrative decision of the New York Office of State Review ("SRO"). The SRO found that the District offered M.T. a free and appropriate public education for the 2008–2009 school year. This decision reversed the prior determination of the Independent Hearing Officer ("IHO") that had awarded tuition reimbursement to Plaintiffs for their unilateral placement of M.T. at Silverado Boys Ranch in Utah ("Silverado") for the 2008–2009 school year. (Def. 56.1 Stmt. ¶¶ 5, 6; Pl. 56.1 Stmt. ¶¶ 5, 6.) Plaintiffs now appeal the SRO decision to this Court.

Before the Court are the parties' cross-motions for summary-judgment. For the reasons set forth below, Defendant's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.

### STATUTORY BACKGROUND

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs ... [and] to en-

sure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A) & (B); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 129 S.Ct. 2484, 2491–92, 174 L.Ed.2d 168 (2009) (discussing the purposes of the IDEA). States receiving federal funding under the IDEA are required to make a free appropriate public education ("FAPE") available to all children with disabilities residing in the state. 20 U.S.C. § 1412(a)(1)(A). To this end, IDEA requires that public schools create for each student covered by the Act an individualized education program ("IEP") for the student's education at least annually. 20 U.S.C. § 1414(d)(2)(A).

 If a school district fails to provide a FAPE to a child with disabilities, the child's parents may remove the child from the improper placement, enroll the child in an appropriate private school, and retroactively seek reimbursement for the cost of private school from the state. *School Committee of Burlington v. Department of Education*, 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). However, this decision is made at the parents' own financial risk. *S.H. and B.P., individually and on behalf of S.H. v. New York City Department of Education*, 2011 WL 666098, at *1 (S.D.N.Y. Feb. 15, 2011). The IDEA specifically contemplates that "when a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education." *Forest Grove*, 129 S.Ct. at 2488.

In New York, parents seeking reimbursement for private school tuition may request a hearing before an IHO. The decisions of an IHO may be appealed to the SRO. N.Y. Educ. L. § 4404. Under the IDEA, the final administrative decision of the state, in New York the SRO deci-

sion, may be reviewed by a federal district court. 20 U.S.C. § 1415(i)(2)(A). The district court may review the administrative record, hear additional evidence, and grant such relief it deems appropriate. 20 U.S.C. § 1415(i)(2)(C).

## FACTUAL BACKGROUND

The following facts are taken from the administrative record (as set forth in the parties' Rule 56.1 Statements) and are undisputed unless otherwise noted.

### 1. M.T.'s Behavioral and Academic Record in the Croton–Harmon District

M.T., born September 25, 1991, attended Croton–Harmon High School ("CHHS") from September 2005 to December 2007.

The Parents began to notice behavioral problems with M.T. when he was in sixth and seventh grades. During that time, he began cutting classes and exhibiting disrespectful behavior at home and at school.

In the 2003–04 and 2004–05 school years, when he was in seventh and eighth grades, M.T. began abusing alcohol and marijuana. The Parents consulted with a school psychologist during this period, as well as a school counselor. At the recommendation of the school psychologist, M.T. was enrolled in therapy with Scott Gillet in eighth grade. Gillet informed the Parents that M.T. was suffering from anxiety and depression. M.T. received both medication and therapy, but both treatments proved ineffective and were stopped within five months. (Pl. 56.1 Stmt. ¶¶ 1–5.)

In the fall of 2005, M.T. entered Croton–Harmon High School as a ninth grader. During his first year of high school, M.T. attained grades ranging from 78–89 (roughly a "B" average). He also accumulated 6 and a half credits towards a New York State Regents Diploma and earned a

Letter of Distinction for his academic achievements in his English class. (Def. 56.1 Stmt. ¶¶ 14–17.) M.T.'s ninth grade behavioral record included one day of in-school suspension, five detentions for "insubordination and misconduct," and one cut class, which was punished by an additional detention. (Def. 56.1 Stmt. ¶¶ 18, 19.) Also during his ninth grade year, M.T.'s drinking and marijuana use increased. M.T. sought treatment for his substance abuse issues and was accepted into a local rehabilitation program. M.T. attended the program briefly, but then refused to attend. (Pl. 56.1 Stmt. ¶ 6.)

In tenth grade, the 2006–07 school year, M.T. received grades ranging from a 68 in Sequential Math to a 91 in Animal Physiology. He also obtained a 94 on the Global History Regents Exam, a 79 on the Math A Regents Exam, and an 88 on the Spanish Regents Exam, earning him seven more credits towards a Regents Diploma. (Def. 56.1 Stmt. ¶¶ 20–22.) M.T.'s tenth grade behavioral record at school included ten detentions for cutting five classes and/or study halls.

The Parents reported that during tenth grade M.T.'s use of marijuana continued, causing the Parents to file a PINS ("Persons in Need of Supervision") petition that enrolled M.T. in state-offered support programs. Through this program, M.T. was assigned a probation officer, obtained a job, and was referred to St. Vincent's Hospital's Excel Program, which provided day treatment for teenagers with substance abuse and emotional problems. After three weeks of treatment, M.T. was kicked out of the program for being disruptive. The Parents then tried to begin family therapy with M.T., but he refused to attend. (Pl. 56.1 Stmt. ¶¶ 7, 8.)

In January 2007, M.T. had a physical altercation with his father that caused the Parents to call 911. Three months later, in March 2007, M.T. had another physical altercation with his father in which he kicked over a coffee table and began throwing things. The police again became involved, and M.T. was brought to the police station because he told the police he could not control himself. (Pl. 56.1 Stmt. ¶ 9.)

In March 2007, M.T. attacked, punched and kicked a fellow student who had been "mouthing off" about him to other students. M.T. was arrested and prosecuted for this incident. M.T. was also disciplined with a five-day out-of-school suspension. (Pl. 56.1 Stmt. ¶ 9.)

On his first day back from the suspension, M.T. was overheard expressing frustration with a math teacher, and said that someone should cut the brake lines on her motorcycle. A teacher overheard M.T.'s comment and reported it to the principal. The principal required M.T. to be evaluated by a psychiatrist to ensure he was fit to return to school. (Pl. 56.1 Stmt. ¶ 9.) The psychiatrist prescribed Zoloft for M.T., but M.T. refused to take the medication. (Pl. 56.1 Stmt. ¶ 11; Def. 56.1 Stmt. ¶ 11.) In spring 2007, the Parents met with an educational consultant who recommended a wilderness program for M.T., but the Parents "were not ready to send their child away." (Pl. 56.1 Stmt. ¶ 12; Def. 56.1 Stmt. ¶ 12.)

In the first quarter of M.T.'s eleventh grade school year, M.T. again maintained passing grades. (Def. 56.1 Stmt. ¶ 25.) M.T.'s parents contend that he took "dumbed down" classes to avoid having to focus on school work. (Pl. 56.1 Stmt. ¶ 14.) In his approximately three months of eleventh grade at Croton–Harmon High School, M.T. served eleven detentions for cutting classes and/or detentions, a single day of in-school suspension for cutting a class, and a single day of out-of-school suspension for insubordination and use of inappropriate language. Records indicate

that M.T. cut between ten and sixteen classes while in eleventh grade.[1] (Def. 56.1 Stmt. ¶ 27–28.) Also in the fall of 2007, M.T. was arrested for possession of marijuana twice in two days. At the police station after one of the arrests, he also cursed and yelled at police officers. (Pl. 56.1 Stmt. ¶ 13.)

On or around December 17, 2007, the Parents finally decided to remove M.T. from CHHS and place him in the Entrada Second Nature Wilderness Program in Utah. The mother called CHHS staff that day to inform them of their decision. On January 2, 2008, the mother sent the school a letter confirming this decision. (Pl. 56.1 Stmt. ¶ 15.)

M.T. remained enrolled in the Entrada Wilderness Program from approximately December 17, 2007 to February 26, 2008. While M.T. was in Utah, by letter dated February 2, 2008, the Parents requested that M.T. qualify for special education services from the District's Committee on Special Education ("CSE"). On February 26, 2008, M.T. completed the Entrada Program and was directly enrolled in the Silverado Boys Ranch School without returning home to New York. (Def. 56.1 Stmt. ¶¶ 50–54.)

### 2. IEP Development by the Committee on Special Education

On February 28, 2008, the District received the "Parent Referral to the CSE Form" from Parents. A CSE meeting was held on March 7, 2008 to consider whether M.T. should be classified as disabled. Present at the meeting were Parents, CHHS faculty members including a special education teacher, a guidance counselor and a school psychologist. The committee reviewed a psychological evaluation

of M.T. prepared by a licensed clinical psychologist from Entrada, a letter from Entrada, reports from three of M.T.'s classroom teachers at CHHS, and M.T.'s behavioral record from CHHS. The psychological report indicated that M.T.'s overall cognitive and academic abilities were generally average or above average, and M.T. did not have any learning disabilities. The report also described M.T.'s behavioral and emotional state; he was diagnosed with "Anxiety Disorder Not Otherwise Specified, Depressive Disorder Not Otherwise Specified, Oppositional Defiant Disorder, Parent–Child Relational Problem, Marijuana Dependence and Alcohol Abuse." (Def. 56.1 Stmt. ¶¶ 62–68.) The committee decided that it did not have sufficient information to classify M.T. at that point and determined it needed a psychiatric evaluation to properly "determine the extent and educational impact of his social and emotional issues." (Def. 56.1 Stmt. ¶ 69.)

After the March 7, 2008 CSE meeting, the District initiated the process of obtaining a psychiatric evaluation of M.T. However, because M.T. was currently located in Utah, the District learned that "it was the responsibility of the district of location, not the district of residence, to perform any evaluations of M.T." (Def. 56.1 Stmt. ¶ 72.) The District advised Parents of this by email on March 26 and 28, 2008. M.T.'s mother informed the District that she sent a letter to M.T.'s district of location (the Garfield School District in Utah) on March 31, 2008. However, no evaluation was ever received by the District. (Def. 56.1 Stmt. ¶¶ 73–75.)

In June 2008, the Parents advised the District that they expected M.T. to return

1. Plaintiffs dispute the number of classes M.T. cut during his eleventh grade year, contending it was approximately 25 classes, rather than 10–16. A review of the school's records

demonstrate that some of the absences cited by Parents were excused or "unknown." (*See* Defendant Ex. 13.)

to CHHS for the 2008–2009 school year. On June 25, 2008, another CSE meeting was held. The meeting had similar participants as the prior meeting, including two CHHS special education teachers. No representative of Silverado attended the meeting. The District asserts that it attempted to arrange the participation of a representative of Silverado but was unsuccessful. However, Parents assert that because no one from Silverado was available at that time, the meeting should have been postponed. (Def. 56.1 Stmt. ¶ 80; Pl. 56.1 Response ¶ 80.) As no psychiatric evaluation of M.T. had been completed, the CSE committee relied on largely the same information as was available at the March meeting; the only additional information considered were two reports of M.T.'s progress from Silverado, an academic record and a treatment review. (Pl. 56.1 Stmt. ¶ 20.) M.T.'s Treatment Review from Silverado, completed in May 2008, indicated that M.T. had improved his attitude at Silverado and began to serve as a role model for other students. He maintained a high grade point average, focused on his school work, and improved his behavior in academic settings. The report noted that M.T. still "becomes oppositional" in reaction to authority and still struggled with the use of marijuana and tobacco/alcohol. (Def. 56.1 Stmt. ¶ 85.)

At the June 25, 2008 meeting, after reviewing the relevant information regarding M.T., the CSE determined that he should be classified as "emotionally disabled." (Def. 56.1 Stmt. ¶ 86; Pl. 56.1 Stmt. ¶ 20.) The CSE recommended seven annual goals for M.T. that addressed his various emotional problems, including contact with authority figures, completion of class work, accepting responsibility and following rules, and coping with stress without resorting to drug or alcohol use. (Def. 56.1 Stmt. ¶ 87.) The parties dispute whether a more restrictive setting (such as an out-of-district placement) was considered. The CSE ultimately recommended that M.T.'s appropriate placement was to return to CHHS and receive additional support services, specifically one hour of consultant teaching per week, a small group learning lab six out of every eight days, and thirty minutes of counseling each week. (District Ex. 21 at 1.) The CSE further recommended that M.T. be placed in additional instructional periods to provide more structure to his school day. The committee requested a copy of the discharge/transition plan from Silverado "so that the School District can best plan for the student's return." (District Ex. 21 at 5.)

The recommendations of the CSE were adopted into an Individualized Educational Plan (IEP) developed for M.T. for the 2008–2009 school year. The IEP was approved by the District's Board of Education on July 8, 2008 and sent to Parents around July 17, 2008. (Def. 56.1 Stmt. ¶ 93.) The parties agree that at the June 25, 2008 meeting, the Parents expressed concern that returning home would lead M.T. to relapse. There is disagreement about when the Parents officially rejected the IEP; the Parents assert that they rejected the IEP at the CSE meeting, while the District asserts that the Parents agreed with the CSE's recommendations at the meeting. It is undisputed, however, that during the summer of 2008 the District continued to request discharge information from Silverado via several phone and email messages to the Silverado staff. Further, Parents never contacted the District about challenging or revising the IEP for M.T. The Parents emailed the District in August expressing their uncertainty about whether M.T. would return to CHHS. Only in September 2008 did Parents definitively inform the District that M.T. would not be returning. (Def. 56.1 Stmt. ¶¶ 94–97; Pl. 56.1 Stmt. ¶ 22.)

### 3. Student's Performance at the Silverado Boys Ranch School

M.T. was placed at Silverado Boys Ranch School in Utah at the suggestion of his psychologist at the wilderness program. Dr. Matthew Hoag, a psychologist formerly employed by the Second Nature Entrada Wilderness Program, evaluated M.T. in December 2007 and early 2008 after he was removed from CHHS. Dr. Hoag testified that M.T. needed the wilderness program because the negative coping strategies he used to deal with his anxiety and depression had become destructive. During the Entrada program, Dr. Hoag found that M.T. made some progress; his angry outbursts and emotional instability decreased. Dr. Hoag recommended that M.T. enroll in a residential program because he needed structured support to further develop positive coping strategies; without further assistance, Dr. Hoag believed M.T. would relapse into destructive behaviors and further substance abuse. Dr. Hoag recommended Silverado to the Parents. (Pl. 56.1 Stmt. ¶¶ 23–27.)

Silverado, located in Utah, offers an accredited academic program combined with therapeutic and behavioral components addressing students with emotional and behavioral problems. Its focus is on providing mental health treatment, though it does provide some optional substance abuse programs. (Def. 56.1 Stmt. ¶¶ 105–107; Pl. 56.1 Stmt. ¶¶ 29–30.) Each student has a primary therapist for behavioral and emotional issues. In addition to approximately 28 hours per week of academic instruction, each student participates in group therapy, individual therapy, group meetings, recreation, and work projects. Class sizes are generally eight to ten students. The school stresses values such as truthfulness, responsibility, service and tenacity. It also requires students to maintain a minimum grade point average and exhibit certain behaviors. (Pl. 56.1 Stmt. ¶ 31; Def. 56.1 Stmt. Ml 109–112.)

Dr. Kreg Gillman, the Executive Director of Silverado, recounted that he believed M.T. was appropriately placed at the school. M.T. succeeded academically at Silverado, but Gillman testified that although M.T. displayed the capacity for honors-level classes, he could not take such classes there because Silverado does not offer them. (Def. 56.1 Stmt. ¶¶ 114–15; Pl. 56.1 Stmt. ¶ 32.) The school was able to offer M.T. some advanced classes, including physics and psychology. (Pl. 56.1 Resp. ¶ 115.) As of September 2008, Silverado's Treatment Plan Review indicated that M.T. was developing numerous positive behaviors, including effective leadership and strong peer relationships. That review noted that M.T. was at the final level of Silverado's program, known as "transition." (Def. 56.1 Stmt. ¶ 116.)

In December 2008, M.T. received his final treatment review from Silverado. The review indicates that M.T. regressed in his final weeks at Silverado, which the Parents assert was attributable to his anxiety at returning home. M.T.'s final report indicates that he exhibited a negative attitude at times, expressed anger inappropriately, and sabotaged relationships with his peers. (Def. 56.1 Stmt. ¶¶ 117–18; Pl. 56.1 Stmt. ¶ 34.) Immediately before leaving Silverado, M.T. did apologize to his peers and urge them to continue to follow the Silverado program. (Pl. 56.1 Stmt. ¶ 34.) On or about December 19, 2008, M.T. graduated from Silverado at the second-highest treatment level and received his high school diploma. He did not complete all of Silverado's treatment goals. (Def. 56.1 Stmt. ¶ 120–22; Tr. 541:15–17.)

### 4. Impartial Hearing and SRO proceeding

On November 19, 2008, the Parents filed an impartial due process hearing request

with the New York: State Education Department. (District Ex. 35.) The request states that Croton–Harmon School District did not provide a free appropriate public education to M.T. and therefore Parents are entitled to reimbursement for the $6500 per month paid to Silverado for M.T.'s tuition. (*Id.*) An impartial hearing began on April 21, 2009 and denied June 29, 2009 after five days of testimony. By decision dated August 9, 2009, the impartial hearing officer found that the June 2008 IEP was not reasonably calculated to enable the student to receive educational benefits and did not offer the student a FAPE. The IHO awarded the parents full tuition reimbursement. The District then appealed the determination of the IHO to the SRO, or state review officer in September 2009.

On November 3, 2009, the SRO issued a decision annulling the IHO decision. After an extensive review of the facts found at the IHO hearing, the SRO addressed the following issues: 1) whether the CSE in June 2008 was properly composed without a representative of Silverado at the meeting, 2) whether the CSE was wrong to delay M.T.'s determination from March 2008 to June 2008, and 3) whether the District denied M.T. a FAPE.

The SRO first found that the June 2008 CSE was properly composed. The meeting participants (including a special education teacher and school psychologist) met applicable federal and state regulations. (SRO Decision at 13.)

Next, the SRO determined that because the Parents did not argue before the IHO that it was improper for the CSE to delay creating M.T.'s IEP until June 2008, they could not then raise the issue before the SRO. (SRO Decision at 13.)

Finally, the SRO found that the IHO erred in determining that the June 2008 IEP did not offer the student a FAPE. The SRO concluded that the District properly identified the student's needs and offered an individualized plan to address those needs through the additional support services proposed if M.T. had returned to CHHS. Further, the SRO noted that the hearing record indicated that the District intended to revise the IEP as necessary to meet M.T.'s needs once he returned. The SRO additionally concluded that the IHO erred in finding that the student's needs required placement in a residential placement program. In light of the preference under the IDEA for the least restrictive placement for any student, the SRO determined that M.T. could handle the academic challenges of CHHS and that the CSE was correct in concluding that M.T. would not need a residential placement for the 2008–09 school year. (SRO Decision at 14–19.)

## STANDARD OF REVIEW

A district court reviewing the final determination of the SRO applies a "modified de novo review." *R.B. v. New York City Dept. of Educ.*, 713 F.Supp.2d 235, 244 (S.D.N.Y.2010) (quoting *Student X v. N.Y. City Dep't of Educ.*, 2008 WL 4890440, at *3 (E.D.N.Y. Oct. 30, 2008)). The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed. *Gagliardo v. Arlington Central School Dist.*, 489 F.3d 105, 112 (2d Cir.2007). While a district court must conduct an independent review of the evidence and make a determination based on the preponderance of the evidence, this review should not invite the courts to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 206–08, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Further, where, as here, the SRO disagrees with the findings of the IHO, the earlier IHO decision "may be afforded diminished weight." *Gagliardo*, 489 F.3d at 113 n. 2. Federal courts should show defer-

ence to the final decision of the state authorities "even where the reviewing authority disagrees with the hearing officer." *A.C. ex rel. M.C. v. Board of Educ. of the Chappaqua Central School District,* 553 F.3d 165, 171 (2d Cir.2009) (internal quotations and citations omitted).

■ To determine whether the Parents are entitled to a tuition reimbursement, the Second Circuit engages in a three-step analysis. *A.C. ex rel. M.C.,* 553 F.3d at 171. First, a court must examine whether the state has complied with the procedures set forth in the IDEA. Second, a court must determine "whether the IEP is substantively appropriate in that it is 'reasonably calculated to enable the child to receive educational benefits.' " *Id.* Finally, only if the IEP is procedurally or substantively deficient, the court then examines whether the private schooling obtained by the parents was appropriate to the needs of the child. This determination takes into account "equitable considerations," including the reasonableness of the parents' action, in determining whether a tuition reimbursement should be awarded. *Id.* The party commencing the administrative review, here the Parents, bear the burden of persuading the court as to the inappropriateness of the IEP and the appropriateness of the private school placement. *Gagliardo,* 489 F.3d at 111–12.

## LEGAL ANALYSIS

### 1. The IEP was not procedurally defective.

Plaintiffs argue that the District failed to comply with the procedural requirements of the IDEA and New York State law and that these failures caused a loss of educational opportunities for M.T., thus denying him FAPE.

■ A procedural error in the development of an IEP only renders the IEP procedurally defective if the error impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision making process, or caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

#### a. The Composition of the CSE

■ Plaintiffs first argue that the District erred by failing to ensure that a representative from M.T.'s then-school, Silverado, participated in the CSE meeting where the IEP was created. Plaintiffs assert that this failure violated both federal and state regulations requiring that at least one special education teacher of the child attend the CSE meeting, namely the person who is or will be implementing the IEP. 34 C.F.R. § 300.344(a)(3); 8 NYCRR § 200.3(a)(1). Parents assert that without the input of the teachers at Silverado, who had the most knowledge about M.T.'s needs, the resulting IEP is invalid.

The parties do not dispute that the June 25, 2008 CSE meeting was attended by two special education teachers at CHHS, Dan Delaney and Rochelle Frisch, as well as the school psychologist Eric Rosen. Further, Mr. Delaney taught twelfth grade special education, and therefore if M.T. had returned to CHHS, Mr. Delaney may have been M.T.'s learning lab teacher. Further, Eric Rosen testified that he tried to secure the participation of a representative of Silverado by contacting a staff member there, but these efforts were unsuccessful. (IHO Tr. 277:14–278:14.)

Courts in this Circuit have upheld the validity of an IEP even where a special education teacher is absent from the CSE meeting. Courts finding that such an error did not deny a student a FAPE considered whether the participants in the meeting had the requisite expertise to ensure that a student's special education options were properly considered. *A.H. on behalf of J.H. v. Dep't of Education of the City of New York,* 394 Fed.Appx. 718, 720–21 (2d

Cir.2010); *M.P.G. ex rel. J.P. v. New York City Dept. of Education*, 2010 WL 3398256, at *9 (S.D.N.Y. Aug. 27, 2010).

Here, the Court agrees with the SRO's determination that because the school psychologist participated in the meeting and would have provided counseling under the IEP if M.T. had returned to CHHS, the requirement has been satisfied. (SRO Decision at 13.) Additionally, Mr. Delaney may have been M.T.'s learning lab teacher if he had returned to CHHS. Further, the District made at least some attempt at including a Silverado staff member in the meeting. The committee also considered (and paid great attention) to the evaluations and learning plans from Silverado's staff, which provided insight into M.T.'s needs. Therefore, the Court finds that M.T. was not deprived of a FAPE because no representative from Silverado participated in the meeting, and therefore this argument does not merit a finding that the IEP was procedurally defective.

**b. Failure to Obtain a Functional Behavioral Analysis ("FBA")**

Plaintiff next contends that the IEP is procedurally defective because it failed to require the District to obtain a Functional Behavioral Analysis ("FBA") of M.T. Under the IDEA, when a student's behavior impedes learning, the CSE must consider the use of behavioral interventions and supports to address the behaviors. 34 C.F.R. § 300.324(a). Additionally, New York state requires the development of an FBA for students whose behavior impedes learning. 8 N.Y.C.R.R. 200.4(b)(1)(v). The SRO found that as of June 2008, M.T. was displaying positive behaviors in his classes at Silverado and that a FBA would have been "premature" when M.T. had not yet received the additional services contemplated by the IEP. (SRO Decision at 14–15.)

The Court finds that the preponderance of the evidence supports the SRO's decision that the IEP adequately addressed M.T.'s behavior. In *A.C. ex rel. M.C.*, the Second Circuit held that the failure to conduct an FBA did not render the IEP at issue there legally inadequate, noting that such a decision is "precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers." 553 F.3d at 172(internal quotation and citation omitted). Here, the IEP created by the CSE included numerous strategies to provide greater structure to M.T.'s school day, with the overriding goal of helping him stay focused in school; this demonstrates that the committee considered M.T.'s behavioral needs in the CSE meeting. Given the information available to the committee, including M.T.'s positive behavior at Silverado and his history of average and above-average academic performance at CHHS, it was reasonable for the CSE to conclude that the additional services offered to M.T. would sufficiently address his behavioral issues.

**2. The IEP afforded M.T. a FAPE and is not substantively defective**

Plaintiffs next contend that the IEP is substantively defective because the recommended placement of M.T. at CHHS "with virtually no support would have caused M.T. to educationally regress." (Pl. Opp. Br. at 4.) Specifically, parents argue that M.T.'s emotional and behavioral problems required a residential placement.

**a. The IEP was substantively adequate**

A school district is obligated to provide students with services that are "reasonably calculated to enable the child to receive educational benefit[s]." *Cerra v. Pawling Cent. School District*, 427 F.3d 186, 194–95 (2d Cir.2005) (quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034). However,

a school district is not required to provide "every special service necessary to maximize each handicapped child's potential." *Id.* (quoting *Rowley*, 458 U.S. at 199, 102 S.Ct. 3034). An IEP is substantively adequate if it is likely to produce progress, rather than regression, and affords the student an opportunity for more than just trivial advancement. *Id.*

To make such a determination, a district court must examine the administrative record for objective evidence indicating whether a child is likely to progress or regress under the proposed plan. Because courts lack the educational expertise that administrative agencies have, "deference is particularly important when assessing an IEP's substantive adequacy" and the district court is cautioned against "meddling in state educational methodology." *Id.* at 195. Further, there is a preference under both federal and New York state law that the IEP should provide for the least restrictive environment ("LRE") possible for the student given that student's educational needs. This includes placing a student, when practicable, with their non-disabled peers. *Walczak v. Florida Union Free School Dist.*, 142 F.3d 119, 122 (2d Cir.1998).

A review of the evidence presented at the CSE hearing, the resulting IEP, and the record of the IHO proceeding demonstrates that the SRO was correct in finding that District provided a FAPE in its June 2008 IEP. Based on the information available to the CSE in June 2008, including recent evaluations from Silverado, M.T. had shown significant progress in his time there. The committee specifically considered those areas that M.T. still struggled with—specifically, oppositional behavior and difficulties dealing with authorities—and devised goals tailored to meet those needs. The IEP established that M.T. would receive counseling and small group support to achieve these goals

and assist him in dealing with whatever academic or emotional problems arose in his mainstreamed classes. The IEP further stated that M.T. would be enrolled in more academic classes to ensure that his day was sufficiently structured. Additionally, the CSE planned to revise and update the IEP as necessary when M.T. returned to CHHS. The Court therefore agrees with the conclusion of the SRO that "the June 2008 IEP accurately reflected the student's needs and that the District's recommended program was reasonably calculated to confer educational benefits to the student in the LRE. (SRO Decision at 19.)

**b. A residential placement was not required to afford M.T. a FAPE**

In support of their claim that the IEP was substantively inadequate, Parents argue that M.T.'s June 2008 IEP denied him FAPE because it did not provide M.T. with a residential placement. Parents contend that courts have found residential placements appropriate where, as here, the student's educational and non-academic needs were "unseverable." Because of this, the only way to effectively educate M.T. was through 24–hour supervision. Parents further contend that the CSE's failure to provide M.T. with such a placement ignored all of the medical evidence available. (Pl. Opp. at 6.) The District contends that, after reviewing M.T.'s record at Silverado as well as his prior performance at CHHS, M.T. did not require a residential placement to make meaningful academic progress. The District contends that placement at CHHS with added support services would provide M.T. with the least restrictive environment in which he could make academic progress.

A state must fund a residential program for a disabled child when it is necessary for the child to make meaningful educational progress. Courts focus on

"whether the student's conduct outside of the school building and outside the normal hours of the school day is such that it impedes [the student's] ability to derive an academic benefit from a day program." *M.H. v. Monroe–Woodbury Cent. School. Dist.*, 296 Fed.Appx. 126, 128 (2d Cir. 2008). As the Second Circuit has observed, "While some children's disabilities may indeed be so acute as to require that they be educated in residential facilities, it is appropriate to proceed cautiously whenever considering such highly restrictive placements. IDEA'S preference is for disabled children to be educated in the least restrictive environment capable of meeting their needs." *Walczak*, 142 F.3d at 132 (2d Cir.1998).

Courts in this district and the Second Circuit are reluctant to find that a residential placement is required in the absence of clear evidence indicating that such a placement is the child's only means of achieving academic progress. As the Second Circuit recently noted, "in general, the Second Circuit requires that a court point to objective evidence of a child's regression in a day-program before finding that a residential placement is required by the IDEA." *M.H. ex rel. L.H.*, 296 Fed.Appx. at 128 (denying reimbursement for a residential program where there was no evidence of regression in the child's day program placement and no testimony by certified experts supported the parents' fears of relapse).

 Here, the weight of the evidence demonstrated that M.T. had progressed significantly in his months away from CHHS and could return to the high school with the benefit of increased support services and more structure to his school day. The IEP contemplated that CHHS staff members would communicate with Silverado's staff to ensure it was prepared to assist in M.T.'s transition. Given M.T.'s progress at Silverado and demonstrated

history of academic ability, the SRO was reasonable in concluding that the addition of small group learning labs, one on one counseling, and weekly group meetings with a consultant teacher were reasonably calculated to confer educational benefits on M.T. The Court agrees with the SRO that there is not objective evidence upon which the Court could conclude that a residential placement was required for M.T. to make reasonable academic progress.

Further, while M.T. indisputably had frequent problems outside of school involving criminal activity, drug use, and violence, his academic performance at CHHS was at least average, as he maintained passing grades in his classes and passing scores on five Regents exams. M.T.'s ability to attain passing marks without any additional special education supports in his first two years at CHHS does support the CSE's conclusion that he was capable of attaining academic progress in a non-residential setting. *See Walczak*, 142 F.3d at 130 ("the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress").

Parents rely heavily on the psychological evaluations of Dr. Harvey and Dr. Hoag, completed during M.T.'s enrollment in the Entrada Second Nature Wilderness Program. These reports documented M.T.'s emotional, psychological, and substance abuse problems in recommending a residential placement immediately following completion of the wilderness program in February 2008. Parents point to this recommendation as evidence that the CSE wrongfully concluded that return to CHHS with additional support services would address M.T.'s needs in contravention of medical evidence.

However, M.T.'s need for residential services during the 2007–2008 school year is not at issue here. The CSE focused,

rightly, on M.T.'s skills and needs as of June 2008 and into the 2008–2009 school year. The most recent evaluation from Silverado available at the CSE meeting, completed in May 2008, indicated that M.T. was progressing academically and behaviorally and had improved significantly during his approximately six months of residential placement. M.T.'s mother, C.T., indicated prior to the meeting that they planned for M.T. to return home for his final year of high school. Based on these considerations, the Court agrees with the SRO that the CSE was correct in finding that "the student would no longer require a residential placement for the 2008–2009 school year." (SRO Decision at 18.)

Notably, the only major concern of relapse expressed in the May 2008 report from Silverado, and much of the focus of the psychological evaluations considered by the CSE, involved concerns that M.T. continued to struggle with alcohol and drug use and feared he would continue using controlled substances. (District Ed. 26.) To the extent Parents concerns of "relapse" focused on substance abuse, such issues cannot provide a basis for residential placement under the IDEA; "while a residential placement may have been the most effective way to treat [the student's] substance-abuse problem, that treatment was not the District's responsibility." *P.K. ex rel. P.K. v. Bedford Cent. School District* 569 F.Supp.2d 371, 387 (S.D.N.Y. 2008) (holding that a school district is not responsible for substance abuse treatment, even where the substance abuse and emotional disturbance are intertwined).

For these reasons, the Court finds that the SRO was correct in concluding that the District complied with the substantive and procedural requirements of the IDEA. Therefore, we need not reach the issue of whether M.T.'s private school placement was appropriate.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is denied. The clerk of the court is directed to terminate ECF Docket Numbers 10 and 11 and close the case.

**SO ORDERED.**