T.Y. and K.Y., Individually and On, Behalf of Their Son T.Y., Plaintiffs,

v.

**NEW YORK CITY DEPARTMENT OF EDUCATION, Defendant.**

15–CV–1508 (KAM) (RML)

United States District Court, E.D. New York.

Signed September 30, 2016

Gary S. Mayerson, Maria C. McGinley, Mayerson & Associates, New York, NY, for Plaintiffs.

Sabrina Yasmin Hassan, Nyc Law Department, Son Ky Le, Jonathan L. Pines, The City of New York Law Department Office of Corporation Counsel, New York, NY, for Defendant.

## ORDER ADOPTING REPORT AND RECOMMENDATION

KIYO A. MATSUMOTO, United States District Judge:

Presently before the court is the Report and Recommendation of United States Magistrate Judge Robert M. Levy ("R&R"), filed on August 26, 2016. (ECF No. 29). The R&R recommends that plaintiffs' motion for summary judgment be

GRANTED and defendant's cross motion for summary judgment be DENIED. (R&R at 29). Defendant, the Department of Education ("DOE" or "defendant"), has not objected to the R&R. Plaintiffs T.Y. and K.Y. ("plaintiffs" or "parents") request that the court adopt and affirm the R&R but "raise and preserve" three objections. (ECF No. 30). For the reasons set forth below and upon *de novo* review of the record, the court addresses plaintiff's three objections and ADOPTS the Report and Recommendation in its entirety.

### Background

Plaintiffs brought this action on behalf of their child, T.Y. ("T.Y.")[1] against the New York City Department of Education under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §§ 1400 *et seq.* seeking review of the December 23, 2014 administrative decision of State Review Officer Justyn P. Bates (the "SRO"). (*See* Complaint, dated March 23, 2015, ECF No. 1; Decision No. 13–049 of State Review Officer Justyn P. Bates, dated Dec. 23, 2014 ("SRO Decision"), ECF No. 17–2). The SRO, in its December 23, 2014 Decision, reversed the determination of New York State Impartial Hearing Officer Christine Moore (the "IHO"), and concluded that the individualized education plan ("IEP") that the DOE developed for T.Y. was sufficient to provide T.Y. with a free and appropriate public education ("FAPE") as required under IDEA. (*See* SRO Decision, ECF No. 17–2 at 34).[2]

On September 30, 2015, the parents moved for summary judgment, and on November 4, 2015, the DOE opposed and crossed moved for summary judgment (the "Motions"). (ECF Nos. 15–17, 20–21).

---

1. In this Order and the R&R, T.Y. refers to the minor child.

2. Citations to page numbers refer to the page numbers assigned by the Official Court Electronic Filing System, ECF.

Plaintiffs filed their memoranda opposing the DOE's cross-motion and in further support of their motion for summary judgment on December 1, 2015. (ECF No. 22). On December 4, 2015, the court referred the Motions to Honorable Magistrate Judge Robert M. Levy for a report and recommendation. (Order, dated December 4, 2015). The DOE filed its reply brief on December 16, 2015. (ECF No. 24). Judge Levy heard oral argument from the parties on February 11, 2016, and on August 26, 2016, Judge Levy issued his Report and Recommendation recommending that the court grant the parents' motion for summary judgment, and deny the DOE's cross-motion for summary judgment. (Report and Recommendation ("R&R), ECF No. 29). Judge Levy also recommended that plaintiff's counsel be granted leave to submit an application for attorneys' fees and costs.

The R&R notified the parties that any objections to the R&R must be filed within fourteen days of receipt of the R&R. (*Id.*). By letter dated September 9, 2016, plaintiffs "raised and preserved objections" that the R&R: (1) lacked a finding of cumulative violations by the DOE in failing to provide T.Y. with a FAPE; (2) lacked a specific finding regarding school placement/implementation as determined by the IHO; and (3) did not expressly include in the reimbursement award, reimbursement for T.Y.'s 2012–2013 Rebecca School tuition, T.Y.'s supplemental speech therapy, T.Y.'s 1:1 paraprofessional and transportation costs. (Plaintiff's Objections to R&R ("Objections"), ECF No. 30 at 3). Defendant did not object to the R&R.

### Discussion

For the reasons stated herein, the Court ADOPTS the R&R in its entirety.

### I. Standards of Review

A district court reviews those portions of a Report and Recommendation to which a party has timely objected under a *de novo* standard of review and "may accept, reject, or modify, in whole or in part, the findings or recommendations . . . ." 28 U.S.C. § 636(b)(1)(C). Where no objections to the Report and Recommendation have been filed, however, the district court "need only satisfy itself that that there is no clear error on the face of the record." *Urena v. New York*, 160 F.Supp.2d 606, 609–10 (S.D.N.Y. 2001) (quoting *Nelson v. Smith*, 618 F.Supp. 1186, 1189 (S.D.N.Y. 1985)). "The district court is permitted to adopt those sections of a magistrate judge's report to which no specific objection is made, so long as those sections are not facially erroneous." *Sasmor v. Powell*, No. 11–CIV–4645 (KAM) (JO), 2015 WL 5458020, at *2 (E.D.N.Y. Sept. 17, 2015) (citation and internal quotation marks omitted).

### II. Plaintiff's Objections

Plaintiffs request that the court affirm and adopt the R&R, and "expressly embrace" Judge Levy's specific factual and legal findings, but object to the R&R on three specific grounds as described *supra*, and discussed below. This court nonetheless conducted a *de novo* review of the record and reaches the same conclusions as Judge Levy. Accordingly, the court affirms and adopts Judge Levy's thorough and well-reasoned Report and Recommendation in its entirety.

The court presumes familiarity with the underlying facts and procedural history as set forth in greater detail in Judge Levy's R&R. (R&R, ECF No. 29 at 4–17). Plaintiff first objects to the R&R and argues that Judge Levy "could have and should have made additional findings pursuant to [the] cumulative violations test." (Objections, ECF No. 30 at 3). Plaintiffs argue when viewed with the other serious sub-

stantive FAPE violations that Judge Levy found, Judge Levy should have also found that the DOE's failure to develop a Functional Behavioral Analysis ("FBA"), failure to create a Behavioral Intervention Plan ("BIP"), failure to expressly consider T.Y.'s need for assistive technology, failure to offer parent training and counseling, and failure to plan for T.Y. to transition to a new program and placement further compounded the DOE's overall failure to provide T.Y. with a FAPE. (*Id.*). Second, plaintiffs request that the court adopt the IHO's decision and credibility findings relating to the proper implementation of the IEP at the recommended placement. (*Id.*). Third, plaintiffs also ask that the court specify in any reimbursement award that the parents are entitled to reimbursement for T.Y.'s 2012–2013 Rebecca school tuition, T.Y.'s supplemental speech therapy, and T.Y.'s 1:1 paraprofessional and transportation costs. (*Id.*).

First, the court finds upon *de novo* review, as Judge Levy did, that the SRO's finding that the IEP sufficiently addressed the behavioral concerns in the FBA and the BIP was logically sound and adequately supported by the record. (R&R, ECF No. 29 at 23; SRO Decision, ECF No. 17–2 at 22–24).[3] Accordingly, Judge Levy's deference to the SRO was proper and the court adopts his findings. *M.W. ex rel. S.W. v. N.Y. City Dep't of Educ.*, 725 F.3d 131, 138–39 (2d Cir. 2013) (Deference must be given "to the administrative decision particularly where the state officer's review has been thorough and careful.") (citation and internal quotation marks omitted).

Similarly, the court finds, as Judge Levy did, that the SRO's findings as to T.Y.'s need for assistive technology were proper.

(R&R, ECF No. 29 at 23–25). The IEP described T.Y.'s communication ability and his use of assistive technology to communicate. (IEP, ECF No. 28–14 at 1). It also set annual and short term communication goals that referenced his use of assistive technology. (*Id.* at 9). The SRO found that the IEP was consistent with the information regarding T.Y.'s communication needs that was before the Committee on Special Education ("CSE") and the DOE properly considered T.Y.'s communication needs. (SRO Decision, ECF No. 17–2 at 22). This court agrees with Judge Levy's determination that the SRO's findings regarding assistive technology and T.Y.'s communication program were proper and supported by the record. (R&R, ECF No. 29 at 24–25). Accordingly, the court adopts Judge Levy's finding.

Plaintiffs further argue that Judge Levy should have found that the IEP failed to adequately plan for T.Y. to transition to a new program and placement. (Objections, ECF No. 30 at 3). The SRO found, and Judge Levy agreed, that the IDEA did not require that the IEP include a "transition plan" for T.Y.'s transfer to a new school. (R&R, ECF No. 29 at 26). Upon *de novo* review, the court finds the IEP's failure to include a plan for T.Y.'s transition to a new school was not a procedural error because T.Y. was only 10 years old when the IEP was prepared. *See F.L. v. New York City Dep't of Educ.*, No. 15–CV–520 (KBF), 2016 WL 3211969, at *8 S.D.N.Y. June 8, 2016 (The IDEA requires the IEP to include a transition plan for students 16 years or older; New York state extends this requirement to students 15 and older.) (citing 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa); 8 N.Y.C.R.R. § 200.4(d)(2)(ix)(b)). Further, the court

---

**3.** Citations to page numbers refer to the page numbers assigned by the Official Court Electronic Filing System, ECF.

finds, as the SRO and Judge Levy did, that the IEP properly considered T.Y.'s needs relating to transitions from one activity to another during the school day. (R&R, ECF No. 29 at 26). Accordingly, the court adopts Judge Levy's findings.

■ Next, the plaintiffs object to Judge Levy's deference to the SRO's finding that the IEP's failure to provide for parental training and counseling did not result in a denial of a FAPE. (Objections, ECF No. 30 at 3). Upon *de novo* review, the court agrees with the SRO's and with Judge Levy's reasoning. The Second Circuit has made clear that "[t]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to warrant reimbursement." *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 191 (2d Cir. 2012). Here, plaintiffs are entitled under New York State regulations, as parents of an autistic child, to parent training and counseling regardless of whether the IEP recommends it. *See id.* (citing 8 NYCRR § 200.13(d)); *M.W.*, 725 F.3d at 142). Further, the court finds that the parents had a full opportunity to participate in the IEP process, which *inter alia*, resulted in an IEP that lacked parental counseling. Procedural violations will not amount to denial of a FAPE where "the procedural deficiencies were formalities and the record shows that the Parents were afforded a full opportunity to participate in the IEP process." *R.B. v. New York City Dep't of Educ.*, No. 15–CV–6331, 2016 WL 2939167 (DLC), at *9 S.D.N.Y. May 19, 2016; *see also F.L. ex rel. F.L. v. New York City Dep't of Educ.*, 553 Fed. Appx. 2, 6–7 (2d Cir. 2014). Accordingly, the court agrees with the SRO and Judge Levy, and finds that the IEP's failure to provide for parent training and counseling

did not deny T.Y. a FAPE. (SRO's Decision, ECF No. 17–2 at 27–28; R&R, ECF No. 29 at 25–26).

■ Plaintiffs' second objection is that the school placement/implementation issue should also be considered when viewing the cumulative effect of the DOE's violations. (Objections, ECF No. 30 at 3). Judge Levy determined that the IEP was substantively inadequate and, therefore, properly declined to reach the issue of whether the IEP could be properly implemented at the proposed placement site. (R&R at 35 n.18). The court agrees with Judge Levy's sound reasoning. "A substantive attack on a child's IEP that is couched as a challenge to the adequacy of the proposed placement is [ ] not a permissible challenge—those types of challenges do not relate to the placement's capacity to implement the IEP but to the appropriateness of the IEP's substantive recommendations, which must be determined by reference to the written IEP itself." *J.M. v. New York City Dep't of Educ.*, 171 F.Supp.3d 236, 249 (S.D.N.Y. 2016) (citing *M.O. v. New York City Dept. of Educ.*, 793 F.3d 236, 245 (2d Cir. 2015)). The court finds, on *de novo* review, that because the IEP was substantively deficient, plaintiffs' arguments as to placement/implementation of the IEP need not be addressed. Thus, the court finds, as discussed herein, that the issues plaintiffs identified in their objections, whether considered individually or cumulatively, did not result in a denial of a FAPE. *See F.L. ex rel. F.L.*, 553 Fed. Appx. at 7 (finding that procedural errors did not cumulatively result in a denial of FAPE).

Further, the court, upon *de novo* review, finds as Judge Levy did, that plaintiffs met their burden of establishing that the Rebecca School was an appropriate placement for T.Y. during the 2012–2013 school year. (R&R, ECF No. 29 at 37); *see P.K.*

*ex rel. S.K. v. New York City Dep't of Educ.*, 819 F.Supp.2d 90, 115 (E.D.N.Y. 2011) ("The parents bear the burden of establishing that the placement they selected was an appropriate one.") (citing *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007)). The IHO[4] relied on T.Y.'s teacher and the program director at the Rebecca School, who provided credible testimony about the educational and therapeutic services that T.Y. received during the 2012–2013 school year, when finding that the Rebecca School was an appropriate placement for T.Y. (IHO's Decision, ECF No 17–1 at 23–26). The court finds, as Judge Levy did, that the educational and therapeutic services that T.Y. received at the Rebecca School during the 2012–2013 school year were "specifically designed to meet [T.Y.'s] unique needs," and therefore, agrees with the IHO that the Rebecca School was an appropriate unilateral placement for T.Y. during the 2012–2013 school year. *A.D. v. Bd. of Educ. of City Sch. Dist. of City of New York*, 690 F.Supp.2d 193, 206 (S.D.N.Y. 2010).

Finally, upon *de novo* review, the court finds, as Judge Levy did, that the IHO's findings as to reimbursement for T.Y.'s tuition and related services for the 2012–2013 school year were proper and, therefore, adopts Judge Levy's sound and well-reasoned decision in its entirety.

### Conclusion

For the foregoing reasons, the court ADOPTS Judge Levy's R&R in its entirety. Defendant's cross-motion for summary judgment is **DENIED**. Plaintiffs' motion for summary judgment is **GRANTED** and plaintiffs shall be reimbursed as follows: full reimbursement for T.Y.'s 2012–2013 Rebecca School tuition, T.Y.'s supplemental speech therapy, and T.Y.'s 1:1 paraprofessional and transportation costs. Plaintiffs are granted leave to submit an application for attorneys' fees that complies with 20 U.S.C. § 1415(i)(3)(C) within 21 days of judgment. Defendant may file any objections to plaintiffs' fee application within 21 days thereof. The Clerk of Court is respectfully directed to enter judgment in favor of plaintiffs and close this case.

### SO ORDERED.

### REPORT AND RECOMMENDATION

LEVY, United States Magistrate Judge:

Plaintiffs T.Y. and K.Y. ("plaintiffs" or the "parents") commenced this action on behalf of their child, T.Y. ("T.Y."), against the New York City Department of Education (the "DOE" or "defendant") under the Individuals with Disabilities Education Act ("IDEA"),[1] 20 U.S.C. §§ 1400 <u>et seq.</u>, seeking review of the December 23, 2014 administrative decision of State Review Officer Justyn P. Bates (the "SRO"). (<u>See</u> Complaint, dated Mar. 23, 2015 ("Compl."); Decision No. 13–049 of State Review Officer Justyn P. Bates, dated Dec. 23, 2014 ("SRO Decision"), Dkt. No. 17–2.) In that decision, the SRO reversed the prior determination of New York State Impartial Hearing Officer Christine Moore (the "IHO"), and concluded that the individualized education plan ("IEP") that the DOE developed for T.Y. was sufficient to pro-

---

**4.** The SRO did not address whether the Rebecca School was an appropriate placement for T.Y. during the 2012–2013 school year or whether the equities weighed in favor of a reimbursement award because the SRO determined that the DOE offered T.Y. a FAPE. (SRO Decision, ECF No. 17–2 at 33).

**1.** In 2004, Congress reauthorized the Individuals with Disabilities Education Act as the Individuals with Disabilities Education Improvement Act. <u>See</u> Pub. L. No. 108–446, 118 Stat. 2647 (2004).

vide T.Y. with the free and appropriate public education ("FAPE") to which he is entitled under the IDEA. (See SRO Decision.) The parties have cross-moved for summary judgment. (See Notice of Motion, dated Sept. 30, 2015, Dkt. No. 15; Plaintiffs' Memorandum of Law in Support of Their Motion for a Modified De Novo Review, dated Sept. 30, 2015 ("Pls.' Mem."), Dkt. No. 16; Affirmation of Maria C. McGinley, Esq., dated Sept. 30, 2015, Dkt. No. 17; Notice of Cross–Motion for Summary Judgment, dated Nov. 4, 2015, Dkt. No. 20; Defendant's Memorandum of Law in Support of Its Cross–Motion for Summary Judgment and In Opposition to Plaintiffs' Motion for Summary Judgment, dated Nov. 4, 2015 ("Def.'s Mem."), Dkt. No. 21; Plaintiffs' Memorandum of Law in Opposition to Defendant's Cross–Motion and In Further Support of Plaintiffs' Motion for a Modified De Novo Review, dated Dec. 1, 2015, Dkt. No. 22 ("Pls.' Reply"); Defendant's Reply in Support of its Cross–Motion for Summary Judgment, dated Dec. 16, 2015 ("Def.'s Reply"), Dkt. No. 24.)

On December 4, 2015, the Honorable Kiyo A. Matsumoto, United States District Judge, referred the parties' motions to me for a Report and Recommendation. (Order, dated Dec. 4, 2015.) 1 heard oral argument on February 11, 2016. (Minute Entry, dated Feb. 11, 2016.) For the reasons stated below, I respectfully recommend that plaintiffs' motion for summary judgment be granted and that defendant's cross-motion be denied.

BACKGROUND

A. Legal Background

■ "A state receiving federal funds under the IDEA must provide disabled children with a free and appropriate public education [ ("FAPE") ]." R.E. v. New York City Dep't of Educ., 694 F.3d 167, 174–75 (2d Cir. 2012) (citing Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005)); see 20 U.S.C. § 1412(a)(1)(A). "To ensure that qualifying children receive a FAPE, a school district must create an [IEP] for each such child." R.E., 694 F.3d at 175 (citing 20 U.S.C. § 1414(d)); Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system). "The IEP is 'a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes specially designed instruction and services that will enable the child to meet those objectives.' " R.E., 694 F.3d at 175 (quoting D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 507–08 (2d Cir. 2006)); see 20 U.S.C. § 1414(d)(1)(A). "The IDEA requires that an IEP be 'reasonably calculated to enable the child to receive educational benefits.' " R.E., 694 F.3d at 175 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).

■ "In New York, the state has assigned responsibility for developing IEPs to local Committees on Special Education" ("CSEs"). Id. (citing N.Y. EDUC. LAW § 4402(1)(b)(1); Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 123 (2d Cir. 1998)). CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school district representative, a parent representative, and others. Id. (citing N.Y. EDUC. LAW § 4402(1)(b)(1)(a)). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." Id. (citing Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107–08 (2d Cir. 2007)). "In devel-

oping a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107–08 (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1 (ww)(3)(i)).

"If a parent believes that his child's IEP does not comply with the IDEA, the parent may file a 'due process complaint' (a type of administrative challenge unrelated to the concept of constitutional due process) with the appropriate state agency." R.E., 694 F.3d at 175 (citing 20 U.S.C. § 1415(b)(6)). "In such cases, the IDEA mandates that states provide 'impartial due process hearings' before impartial hearing officers [ ("IHOs") ]." Id. (citing 20 U.S.C. § 1415(f)). "Under New York's administrative system, the parties must first pursue their claim in a hearing before an IHO." Id. (citing N.Y. Educ. Law § 4404(1)). "Either party may then appeal the case to the [SRO] who may affirm or modify the IHO's order." Id. (citing N.Y. Educ. Law § 4404(2)). "Either party may then bring a civil action in state or federal court to review the SRO's decision." Id. (citing 20 U.S.C. § 1415(i)(2)(A)).

## B. Facts [2]

### 1. Background

T.Y. was diagnosed with autism at age two-and-a-half. (New York City Department of Education Social History Update ("Social History"), dated Feb. 16, 2012, Dkt. No. 28–57.) According to the section of the DOE's Social History Update titled "Parents [sic] View of Problem/Concerns," he presents with "severe physical, emo-

tional, and educational issues" including "severe" Apraxia, weak body tone and muscles, weak gross and fine motor skills, and has a history of "extreme temper tantrums." (Id.) At age two-and-a-half, he began to receive early intervention services in speech-language therapy, occupational therapy, and physical therapy. (Id.) According to the mother, these services were delivered utilizing the Applied Behavior Analysis ("ABA") treatment methodology. (Impartial Hearing Transcript, dated Aug. 21, Dec. 7, Dec. 18, Dec. 19, Dec. 20, Dec. 21, 2012 ("Tr."), at 609, Dkt. Nos. 28–5 through 28–10.) [3] From age three to six, he attended Marcus Avenue, a public school program for children with autism. (Social History; Findings of Fact and Decision No. 139771 of Impartial Hearing Officer Christine Moore, Esq., dated Feb. 21, 2013 ("IHO Decision"), at 7, Dkt. No. 17–1.) According to the mother, this program utilized the Treatment and Education of Autistic and Communication-related handicapped Children ("TEACCH") instructional methodology, (Tr. at 609–10.) She testified that T.Y. was not responsive to this methodology, as "it made him very upset." (Id. at 610; see also Social History at 2.)

In September 2006, the parents transferred T.Y. to the Rebecca School, a therapeutic private school. (Social History at 2; Tr. at 212.) According to Tina McCourt, the Rebecca School's program director, its "overriding methodology" is the Developmental Individual-difference Relationship-based methodology ("DIR/ Floor time"). (Tr. at 240–42 (describing the model).) According to a Rebecca School Interdisciplinary Report of Progress Update, dated June 2012, T.Y.'s Rebecca classroom at

---

**2.** The facts herein are drawn from exhibits in the underlying administrative record and testimony at the impartial hearing.

**3.** The impartial hearing transcript is docketed in separate portions as follows: pp. 1–11 at ECF Dkt. No. 28–5; pp. 15–138 at 28–6; pp. 141–268 at 28–7; pp. 271–498 at 28–8; pp. 501–712 at 28–9; and pp. 715–780 at 28–10.

that time consisted of eight students, one head teacher, two teacher's assistants, and a 1:1 paraprofessional assigned to T.Y. (Rebecca School Interdisciplinary Report of Progress Update, dated June 2012 ("June 2012 Progress Report"), Dkt. No. 28–55.) Further, according to this document, his Rebecca program consisted of, inter alia: occupational therapy provided three times per week in thirty minute sessions, twice individually and once in a "sensorimotor group with peers"; physical therapy two times per week for thirty minute sessions, once individually and once in a group of two; speech-language therapy four times per week in thirty minute sessions, three times individually and once in a "cooking group" of four students; and music therapy on a 1:1 basis twice a week for thirty minutes. (Id. at 2–4.) These were provided in addition to his academic program. (See id. at 1–2.) Additionally, according to an Emilia's Kids Related Service Student Progress Report, dated January 31, 2012, T.Y. was receiving speech therapy five times per week after school in sixty-minute sessions from Emilia's Kids. (Emilia's Kids Related Service Student Progress Report, dated Jan. 31, 2012 ("Emilia's Kids Progress Report"), Dkt. No. 28–20.)

## 2. The CSE Meeting

T.Y. was ten years old when the CSE convened on June 5, 2012 to develop his IEP for the 2012–13 school year. (IHO Decision at 6.) His sixth grade year was to start in July. (Id.) The following persons participated in the CSE meeting: the mother; the grandmother; Dr. Craig Czarnecki, as the DOE school psychologist and as district representative; a DOE special education teacher; a DOE social worker; Nicole Mucherino, T.Y.'s teacher at

Rebecca during the 2011–12 school year and in the summer of 2012; a Rebecca social worker; and a parent member. (See IEP No. 207572942, implementation date of July 2, 2012 ("IEP"), at 22, Dkt. No. 28–14; IHO Decision at 9.) According to the mother, the meeting lasted for approximately two hours. (Tr. at 612.)

Dr. Czarnecki testified that the following documents were reviewed at the meeting: the student's prior 2011–12 school year IEP; the June 2012 Rebecca Progress Report; a Psycho-educational Evaluation conducted by Dr. Geraline Davis, dated January 19, 2012; and the DOE Social History Update. (Tr. at 55–57.)

Ms. Mucherino testified that she was present during Dr. Davis' psycho-educational evaluation of T.Y.; that the written report contained certain inaccuracies; and that she raised her concerns with the report at the CSE meeting. (See Tr. at 529–32.) According to her, Dr. Czarnecki responded by stating that "sometimes they do find inconsistencies in Dr. Davis' report and that he's not basing anything on the actual IEP off of Dr. Davis' report." (Id. at 532.) The mother also testified that she too raised concerns about inaccuracies in this report at the meeting. (Tr. at 603–04.)

Dr. Czarnecki was unable to recall whether the mother provided any documents or evaluations from an outside speech-language provider either prior to or during the meeting.[4] (Tr. at 57, 92.) However, the mother testified that she sent the Emilia's Kids Progress Report to the DOE prior to the meeting and that she also brought a copy of the report with her to the meeting. (Tr. at 612.) When she attempted to introduce the report at the meeting, Dr. Czarnecki would not read it. Instead, he placed it in the middle of the

4. I note that Dr. Czarnecki testified that he participated in approximately 200 CSE meet- ings in preparation for the 2012–13 school year. (Tr. at 84–85.)

table and made no further reference to it. (Tr. at 615–16.) Similarly, when T.Y.'s mother requested a continuation of T.Y.'s speech-language therapy sessions. Dr. Czarnecki declared that the CSE meeting would only address those services which were to be part of the school day, not services that were provided after school. (Id. at 527.) The mother also testified to this exchange. (Id. at 616–17.) Dr. Czarnecki was unable to recall at the hearing whether there had been discussion of after-school speech-language therapy. (Tr. at 92–93.)

Ms. Mucherino voiced her concern at the meeting that the goals and progress evaluation contained in the June 2012 Rebecca Progress Report were predicated on a classroom that utilized the DIR methodology and had an 8:1:3 student to teacher ratio. (Id. at 520–21.) She told the CSE that the program it was considering did not have enough support for T.Y., and testified before the IHO that Dr. Czarnecki did not address instructional methodology at the CSE meeting. (Id. at 523.) T.Y.'s mother testified that she expressed her concern that the recommended staffing ratio was insufficiently supportive. (Id. at 696.) She raised questions about instructional methodology during the meeting, inquiring as to whether there were any available programs that utilized DIR, but Dr. Czarnecki declared that methodology would not be discussed during a CSE meeting. (Id. at 617–18.)

### 3. The IEP

Under the heading "Academic Achievement, Functional Performance, and Learning Characteristics," the IEP that the CSE developed describes T.Y. as "a nonverbal child who communicates using a combination of gestures, signs, word approximations and a communication book." (IEP at 1.) The IEP also contains descriptions of his social development, physical development, and management needs. (See id. at 1–2.) It indicates that his instructional/functional skills are at a kindergarten level in reading and a pre-kindergarten level in math. (Id. at 16.)

The IEP sets forth nineteen annual goals relating to: engagement in various settings; increased regulation; literacy skills; math skills; life skills; science skills; sensory processing and regulation to aid interaction; motor planning and sequencing; visual-spatial skills to increase independence; functional negotiation skills and overall muscle strength to allow for safe movement; balance skills to allow for fluid ambulation; improved endurance in group activities; engagement and pragmatic language skills to increase his ability to participate in a continuous flow of communication; language skills and expressive ability; oral motor skills; communicativeness through two-way purposeful communication; and inter-responsiveness and relatedness through counseling. (See id. at 3–11.) Each annual goal includes: criteria for measurement, referring to respective short-term goals; methods to measure progress; and a schedule for the measurement of progress. (See id.)

The IEP recommends a twelve-month program in a 6:1:1 (six students; one teacher; one teacher's assistant) special education classroom in a DOE specialized school. (Id. at 11, 13, 15.) With respect to related services, the IEP recommends: speech-language therapy four times per week in forty minute sessions, consisting of three 1:1 sessions and one 2:1 session; physical therapy four times per week in forty minute sessions, three times 1:1 and one time 3:1; occupational therapy four times per week in forty minute sessions; three times 1:1 and one time 3:1; and counseling two times per week individually for forty minutes each session. (Id. at 11–

12.) Each of these services is to be provided in a special education classroom. (Id.) Additionally, the IEP recommends a full-time 1:1 crisis management paraprofessional. (Id. at 12.)

The IEP also indicates the need for a Functional Behavioral Assessment ("FBA") and Behavioral Intervention Plan ("BIP") because "the student need[s] strategies, including positive behavioral interventions, supports and other strategies to address behaviors that impede [his] learning or that of others." (Id. at 22.) The CSE thus developed an FBA and a BIP. (See id. at 19–20 (FBA), 21 (BIP).) The FBA targets three interfering behaviors: hair pulling and eating carpet fibers when dysregulated; and getting stuck looking at corners of objects when dysregulated. (Id. at 19.) It fails to include the frequency, duration, and intensity of such behaviors, but contains other information relating to their occurrence and lists, inter alia, previously attempted interventions and planned interventions. (Id.) The BIP is a one-page document that targets the same three behaviors. (Id. at 21.) It identifies expected behavior changes, methods and criteria for outcome measurement, and persons responsible for implementation. (Id.)

### 4. The Placement Classroom and the Parents' Unilateral Placement

By letter to CSE Chairperson Elissa Finkelstein, dated June 15, 2012, the parents informed the DOE that they had not received a copy of the IEP or a Final Notice of Recommendation ("FNR"). (See Letter of Parents to Elissa Finkelstein, dated June 15, 2012, Dkt. No. 28–15.) They also advised the DOE that "in the absence of an appropriate program or placement, [T.Y.] will attend the Rebecca School ... for the 2012–2013 twelve-month school year, as a component of his educational placement." (Id. (emphasis in original).)

The parents also asserted that they would seek reimbursement and/or prospective funding for: tuition and costs at Rebecca; five hours per week of 1:1 home-and-community-based speech language therapy; two hours per week of parent training and counseling; transportation to and from Rebecca; and a compensatory award for pendency services to which T.Y. was entitled but which he did not receive. (Id.)

On June 20, 2012, the parents tendered a $10,000 deposit to Rebecca to enroll T.Y. for the school year due to commence in July. (See Affidavit of Tina McCourt, Rebecca Program Director, sworn to Sept. 10, 2012, Dkt. No. 28–21.) By FNR dated June 20, 2012, the DOE summarized the content of the program and related service recommendations and identified the placement site for the 2012–13 school year as P075Q at the Robert E. Peary School ("P 75Q"). (FNR, dated June 20, 2015, Dkt, No. 28–16.) It also informed the parents of their right to visit the site and identified DOE employee Nancy Funke as the contact person whom the parents could contact to discuss the DOE's decision. (Id.)

By letter addressed to Nancy Funke, dated June 25, 2012, the parents stated that they were "not afforded any opportunity to participate in site selection, or even a discussion on that topic, before this decision was unilaterally made." (Letter of Parents to Nancy Funke, dated June 25, 2012, Dkt. No. 28–17.) They also indicated that they would try to visit the site and requested answers to twenty-one enumerated questions about the site to assist in their decision-making process. (Id.) According to the mother, the DOE did not respond. (Tr. at 625.)

The mother visited the placement site on June 26, 2012 and was provided with a tour by Willie Rose, a guidance counselor. (See Letter of Parents to Elissa Finkelstein, dated July 5, 2012 ("Parents'

7/5/2012 Ltr."), Dkt. No. 28–18; Tr. at 718.) In their letter of July 5, 2012 to CSE chairperson Elissa Finkelstein, the parents informed the DOE of their determination that the recommended program was inappropriate for T.Y., and that they would seek reimbursement and/or prospective funding for the unilateral program. (Parents' 7/5/2012 Ltr.) They further enumerated thirty-six concerns about the proposed placement site, which had informed their decision. (See id.)

### 5. Proceedings Before the IHO

The parents filed a due process complaint on July 9, 2012, contending that: (1) the DOE substantively and procedurally failed to offer T.Y. a FAPE for the 2012–13 school year; (2) the parents' private school placement, program, and interventions were reasonably calculated to confer meaningful educational benefits to T.Y.; and (3) no equitable considerations warranted a reduction or preclusion of reimbursement.[5] (Demand for Due Process, dated July 9, 2012, Dkt. No. 28–11.) The IHO conducted six non-consecutive days of impartial hearing on August 21, 2012, December 7, 2012, and December 18 through December 21, 2012. (See IHO Decision at 3.)

The following witnesses were called by the DOE: Dr. Czarnecki (Tr. at 49–135); Anthony Loades, an assistant principal at P 75Q, the proposed placement (id. at 148–207); Willie Rose, the guidance counselor at P 75Q who gave the mother a tour on June 26, 2012 (id. at 716–49); and Jennifer Graham, a teacher at P 75Q in a 6:1:1 classroom (id. at 749–64).

The following witnesses were called by the parents: Tina McCourt, Rebecca program director (id. at 209–67, 366–84); Nancy Funke, DOE special education evaluation, placement, and program officer, and the contact person listed on the June 20, 2012 FNR (id. at 276–86); Lauren Sanders, T.Y.'s Rebecca teacher for the 2012–13 school year, contemporaneous with the hearing dates (id. at 304–66); Kenji Takeda, T.Y.'s Rebecca music therapist for the 2012–13 school year (id at 385–96); Arielle Klig, T.Y.'s Rebecca physical therapist during the same period (id. at 396–423); Jennifer Shonkoff, T.Y.'s Rebecca speech therapist for the same period (id. at 423–69); Kimberly Bishop, T.Y.'s Rebecca occupational therapist for the same period (id. at 469–97); Nicole Mucherino, T.Y.'s Rebecca teacher during the 2011–12 school year, the summer of 2012, and CSE participant (id. at 504–47); Liliya Musheyeva, an Emilia's Kids speech-language pathologist who worked with T.Y. from September 2008 through June 2009, and January 2011 through the hearing dates (id. at 547–97); and the mother (id. at 598–705).

In her twenty-seven-page decision dated February 21, 2013, the IHO found, inter alia, that: there is ample evidence in the record that the 6:1:1 placement with a 1:1 paraprofessional would not provide T.Y. with sufficient support to make educational progress and "it appears the 6:1:1 program was recommended because an appropriate program with additional support was not available" (IHO Decision at 12); the seven resources recommended to address the

---

**5.** The parents submitted an amended due process complaint on September 7, 2012, and a second amended due process complaint on November 15, 2012. (See Amended Demand for Due Process, dated Sept. 7, 2012, Dkt. No. 28–13; Second Amended Demand for Due Process, dated Nov. 15, 2012, Dkt. No. 28–37;

see also SRO Decision at 6 n.4 (describing the amended due process complaint as "nearly identical" and describing the five additional claims in the second amended due process complaint, as well as the parents' waiver of claims at the impartial hearing).)

student's management needs are "woefully inadequate" (id. at 13); the IEP fails to provide for a sensory diet, use of a sensory gym, music therapy, community walks, or a transition plan, each of which is "needed to address the student's needs in order for him to make educational progress" (id.); the IEP fails to provide for any instructional methodologies and/or strategies that have proven successful for the student (id.); sign language is an "incredibly important" component of the student's program and the IEP is "silent" with regard to communication supports, such as the Picture Exchange Communications System and sign language, as part of his communication program or needs (id. at 17, 21); the Emilia's Kids Progress Report, which recommended five one-hour sessions of speech-language therapy per week was not reviewed at the CSE meeting, its recommendations are "consistent with the evidence of record," and the student had a "demonstrated need" for extended day speech-language services (id. at 18, 21); the FBA fails to include the frequency, duration and intensity of the student's interfering behaviors and fails to include all of the student's interfering behaviors such as tantrums, aggressive behaviors, and hand biting (id. at 19); the failure to conduct an "adequate" FBA is a "serious" procedural violation, and the IEP does not contain adequate strategies to address the student's problem behaviors (id. at 20); the BIP targets only three behaviors and does not contain information on how to implement expected behavioral changes (id. at 19); the BIP was not completed at the meeting and there is no evidence that the parent or other attendees participated in its development (id.); the IEP fails to accurately reflect the results of evaluations to identify the student's needs and provide for the use of appropriate special education services (id. at 20); the CSE did not have sufficient credible evaluative material

before it and failed to consider the material that was before it (id.); the DOE failed to meet its burden of proof that the IEP would be properly implemented at the recommended placement because "there was no assurance that the DOE could meet the student's related services mandate" and because it failed to establish the size and composition of the recommended placement and how, or if, the student's behavioral management, academic, social/emotional, and physical management needs would be met (id. at 21–22).

Based on these findings, the IHO determined that the DOE failed to offer T.Y. a FAPE for the 2012–13 school year. (Id. at 22.) She further found that the parents had met their burden of demonstrating that the private school and other services selected for T.Y. were appropriate to meet the student's special education needs (id. at 22–25), and that no equitable considerations warranted a reduction or denial of reimbursement because the parents had "fully cooperate[d]" with the CSE. (Id. at 25–26.) Accordingly, the IHO ordered the DOE to provide reimbursement and/or fund a prospective award for tuition and costs at Rebecca, five hours per week of after-school speech-language therapy, and transportation costs for the twelve-month 2012–13 school year, as well as to provide a related services authorization for provision of a 1:1 paraprofessional during such time. (Id. at 26–27.)

### 5. The DOE's Appeal to the SRO

On March 28, 2013, the DOE appealed the IHO's decision, arguing, inter alia, that the IHO erred in determining that it had failed to offer T.Y. a FAPE for the 2012–13 school year, and erred in determining that Rebecca was an appropriate unilateral placement. (SRO Decision at 8; see Notice with Petition, dated Apr. [Sic] 28, 2013, Dkt. No. 28–77.) The DOE did not contest

the IHO's findings regarding equitable considerations concerning reimbursement. (SRO Decision at 8.) By answer and cross-appeal dated Apr. 4, 2013, the parents asserted, inter alia, that the IHO properly found that the DOE denied the student a FAPE, that the unilateral program was appropriate, and that equitable considerations supported their claims.[6] (Id. at 9; see Answer and Cross–Appeal, dated Apr. 4, 2013, Dkt. No. 28–78.) The DOE then answered the cross-appeal. (See Answer to Cross–Appeal, dated May 3, 2013, Dkt. No. 28–80.)

The SRO issued a thirty-two-page decision on December 23, 2014. He found, inter alia, that: the evaluative data considered by the CSE and the input from the participants during the meeting provided the CSE with sufficient functional, developmental, and academic information about the student and his individual needs (SRO Decision at 18); the annual goals and short term objectives in the IEP were appropriate and sufficiently specific, could be implemented in another setting aside from Rebecca, and could be employed with a non–DIR methodology (id. at 18–19); the CSE adequately considered the student's methods of communication and recommended appropriate annual goals relating to his use of sign language (id. at 19–20); the CSE was aware of the student's behaviors that interfered with his instruction, identified his behavioral needs in the IEP, and developed management needs and annual goals to address those needs (id. at 20–23); although the FBA and BIP did not include the level of detail required by state

regulations or specify every interfering behavior identified and discussed by the CSE, the IEP also identifies the student's behavioral needs, includes an annual goal to address them, and includes provision for a 1:1 paraprofessional to assist in addressing interfering behaviors (id.); the IHO's finding that a 6:1:1 classroom was recommended because an appropriate program with additional support was not available is without support in the hearing record (id. at 23–25); the 6:1:1 special class placement with the additional recommendations constituted an appropriate placement and satisfied the need for 1:1 support (id.); the failure to include provision for parent counseling and training was insufficient, either alone or cumulatively, to support a finding that the DOE failed to offer a FAPE (id. at 25–26); the IDEA does not require an inter-school transition plan and the student's needs relating to transition throughout the school day were appropriately considered and addressed (id. at 26); while the student likely benefited from after-school speech-language therapy sessions, he did not require them in order to receive a FAPE and the DOE was "not required to maximize the student's potential by offering extended day services" (id. at 26–27); there was no evidence of any information before the CSE that the student could not receive educational benefit from educational methodologies other than DIR, and the IHO based her determination in this respect on impermissible retrospective testimony from 2012–13 Rebecca staff (id at 27–29); because the student did not attend the assigned placement site, the

---

**6.** In their answer and cross-appeal, the parents also made an application for the SRO's recusal, arguing, inter alia, that "the Office of State Review is insufficiently staffed, is operating under extremis, triage-like conditions, and is in no position to provide due process to litigants on a careful, thorough, and timely basis." (Answer and Cross–Appeal, dated Apr.

4, 2013, at 1–2.) The SRO denied the request for recusal, finding that "with regard to allegations that decisions from the Office of State Review have been untimely due to staffing, such contentions are not relevant to a recusal inquiry" and there was no other basis for recusal. (SRO Decision at 12.)

DOE was not obligated to present evidence as to how it would have implemented the IEP and, alternatively, the hearing record does not support the conclusion that the DOE would have violated the FAPE legal standard related to IEP implementation (id. at 30–31). Based on these findings, the SRO determined that the DOE offered T.Y. a FAPE for the 2012–13 school year and, as a result, did not reach the issues of whether the unilateral program was appropriate or whether equitable considerations merited the parents' reimbursement.[7] (Id. at 31.)

### DISCUSSION

#### A. Standard of Review

■ "Summary judgment in [an IDEA case] involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009) (quoting Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005)). "The standard of review on such an appeal is somewhat Janus-like." B.R. ex rel. K.O. v. New York City Dep't of Educ., 910 F.Supp.2d 670, 675 (S.D.N.Y. 2012). "On the one hand, the IDEA requires this Court to 'conduct an independent review of the administrative record and make a determination based on a preponderance of the evidence.'" Id. (quoting W.M. v. Lakeland Cent. Sch. Dist., 783 F.Supp.2d 497, 504 (S.D.N.Y. 2011)) (internal brackets and ellipses removed); see 20

U.S.C. § 1415(i)(2)(C). "On the other hand, the Supreme Court has held that such a review is 'by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" B.R., 910 F.Supp.2d at 675 (quoting Rowley, 458 U.S. at 206, 102 S.Ct. 3034)).

■ The Second Circuit has clarified that the "standard for reviewing administrative determinations 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review. In the course of this oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.'" M.H. v. New York City Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012) (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086–87 (1st Cir. 1993)) (internal brackets and ellipses removed). Thus, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." Id. However, "the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role." Id. Accordingly, "determinations regarding the substantive adequacy of an IEP should

---

7. The IDEA includes a pendency provision. See 20 U.S.C. § 1415(j) (providing that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency otherwise agree, the child shall remain in the then-current educational placement of the child . . . .") The SRO determined that, in addition to tuition and costs at Rebecca, five hours per week of 1:1 speech-language therapy, and transportation costs to and from school, T.Y. was also entitled to a 1:1 crisis management paraprofessional as part of his pendency placement for the 2012–13 school year. (See SRO Decision at 16–17; see also IHO's Interim Order on Pendency, dated Sept. 10, 2012, Dkt. No. 28–1; IHO's Second Interim Order on Pendency, dated Dec. 27, 2012, Dkt. No. 28–2.) The parents do not seek review of this portion of the SRO's decision, (Pls.' Mem. at 19.)

be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures" and "[d]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." Id. (internal citations removed). "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not" and "the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." Id. (internal citation removed).

■■■ Finally, "[w]here the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." Id. However, when the district court

■■■ appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court ... to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment.

Id.

B. Standard for Tuition Reimbursement: The Burlington–Carter Test

"To receive reimbursement for a private school placement, parents must satisfy what is known as the 'Burlington–Carter' test, a standard established by the Supreme Court." P.K. ex rel. S.K. v. New York City Dep't of Educ., 819 F.Supp.2d 90, 104 (E.D.N.Y. 2011) (citing M.P.G. ex rel. J.P. v. New York City Dep't of Educ., No. 08 CV 8051, 2010 WL 3398256, at *2 (S.D.N.Y. Aug. 27, 2010)); see also Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Under this well-settled test,

■■■ [a] board of education may be required to pay for the educational program selected by the parent only if (1) the educational program recommended by the board of education was inadequate or inappropriate; (2) the program selected by the parent was appropriate, such that the private program meets the student's special education needs; and (3) the equities support the parent's claim.

P.K., 819 F.Supp.2d at 104 (quoting M.P.G., 2010 WL 3398256, at *2).

1. Prong One of the Burlington–Carter Test

■■■ "In addressing the first prong of the test, a court considers whether the student's IEP was developed according to the procedural and substantive requirements of the IDEA." Id. (citing M.P.G., 2010 WL 3398256, at *2); see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009). Prong one is a threshold finding for reimbursement, since "[i]f a court determines that there has been no procedural or substantive violation of the IDEA, it need not consider the remaining two prongs of the Burlington–Carter test." Id. Finally, given the deference due to the SRO's determination as to prong one, it is "incumbent upon the Par-

ents to bring to the Court[']s attention any procedural or substantive flaws and explain why they allegedly warrant reversal." M.H. v. New York City Dep't of Educ., No. 10 CV 1042, 2011 WL 609880, at *7 (S.D.N.Y. Feb. 16, 2011) (citing W.T. & K.T. ex rel. J.T. v. Bd. of Educ., 716 F.Supp.2d 270, 287 (S.D.N.Y. 2010) (discussing the allocation of the burden of proof in light of New York's statutory scheme)); see also M.W. ex rel. S.W., 725 F.3d 131, 139 (2d Cir. 2013) ("an appellant seeking to have a reviewing court credit an IHO's determination over an SRO's determination would benefit from calling our attention to an SRO's specific errors of law, fact, or reasoning").

### a. Alleged Procedural Violations

█ Plainly, "[t]he initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP,'" M.H., 2011 WL 609880, at *8 (quoting A.C., 553 F.3d at 172). Nonetheless, the statute prescribes that, even where a procedural violation has occurred, a student has been denied a FAPE

> only if the procedural inadequacies (I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii); see P.K., 819 F.Supp.2d at 105; A.D. v. New York City Dep't of Educ., No. 12 CV 2673, 2013 WL 1155570, at *6 (S.D.N.Y. Mar. 19, 2013); M.H., 2011 WL 609880, at *8. However, "'[m]ultiple violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not.'"

A.D., 2013 WL 1155570, at *6 (quoting R.E., 694 F.3d at 190).

### i. Adequacy of the FBA and BIP

The parents contend that the SRO erred in determining that the IEP sufficiently addressed T.Y.'s interfering behaviors. (Pls.' Mem. at 23–26.) Specifically, they take issue with the adequacy of the FBA and BIP that were developed, and with the IEP's alleged lack of specific supports or strategies to mitigate T.Y.'s interfering behaviors. (Id.)

"An FBA provides an 'identification of [a disabled student's] problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior ... and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it.'" M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 139 (2d Cir. 2013) (quoting N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(r)). New York regulations require that the DOE conduct an FBA for a student "whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disability." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(b)(1)(v).

█ It is undisputed that the FBA in this case did not satisfy all regulatory mandates. (See SRO Decision at 23.) The SRO also found that some interfering behaviors of which the CSE was aware were excluded. (Id.) Nonetheless, a "[f]ailure to conduct an FBA [ ] does not render an IEP legally inadequate under the IDEA so long as the IEP adequately addresses a student's behavioral impediments and implements strategies to address that behavior." M.W., 725 F.3d at 140 (citing A.C.,

553 F.3d at 172). Moreover, "whether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are 'precisely the type of issue[s] upon which the IDEA requires deference to the expertise of administrative officers.'" Id. (quoting A.C., 553 F.3d at 172).

 The parents characterize the SRO's reasoning on this issue as conclusory and not entitled to deference. The court disagrees. In R.E., the Second Circuit found that a failure to create an FBA that satisfied state-imposed criteria did not amount to a denial of a FAPE. See R.E., 694 F.3d at 193. It so found because (1) the CSE reviewed detailed documents regarding the student's behavior; and (2) the IEP provided strategies to address those behaviors, "including the use of a 1:1 aide to help [the student] focus." Id. The SRO's discussion mirrors this reasoning: both Dr. Czarnecki and the parent testified that the CSE engaged in a discussion of interfering behaviors (Tr. at 67–68, 620–21; SRO Decision at 21); the June 2012 Progress Report, reviewed by the CSE, contains detailed explanations of behaviors T.Y. may exhibit that interfere with his learning (see June 2012 Progress Report; SRO Decision at 21); an FBA was developed that delineates planned interventions, as well as prior interventions (see IEP at 19); the IEP identifies interfering behaviors, strategies and tools to maintain regulation, and incorporates a related annual goal (see id. at 1, 2, 4; SRO Decision at 23); and provision was made for a 1:1 crisis management paraprofessional (IEP at 12; SRO Decision at 23.). Accordingly, the court defers to the logically sound and adequately supported finding of the SRO that the IEP addressed behavioral concerns appropriately.

### ii. Assistive Technology; Performance Levels and Goals and Objectives

The parents contend that the SRO erred in determining that the CSE adequately considered and incorporated language and communication concerns as a component of the IEP. (See Pls.' Mem, at 19–21.) They first argue that the IEP fails to make provision for "assistive technology." (Id. at 19; see also Pls.' Reply at 6.) Pursuant to the IDEA, a CSE must "consider whether the child needs assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(v). It is undisputed that the box on the IEP indicating whether T.Y. requires such technology is checked "No." (See IEP at 3.)

 An assistive technology device is defined as "any item, piece of equipment, or product system ... that is used to increase, maintain, or improve functional capabilities of a child with a disability." 20 U.S.C. § 1401(1). An assistive technology service is "any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device." Id. § 1401(2). "Although assistive technology will almost always be beneficial, a school is only required to provide it if the technology is necessary. Moreover, the failure to provide assistive technology denies a student [a] FAPE only if the student could not obtain a meaningful benefit without such technology." E.F. v. New York City Dep't of Educ., No. 12 CV 2217, 2013 WL 4495676, at *20 (E.D.N.Y. Aug. 19, 2013). The parents argue that the IEP should have explicitly provided for the Picture Exchange Communications System ("PECS") as requisite technology for T.Y.[8] (Pls.' Mem. at

8. PECS "is a pictures-based method of communication for individuals with autism spec- trum disorder and related developmental disabilities. PECS begins by teaching an in-

20.) The SRO found the IEP's reference to T.Y.'s use of a communications book to have sufficiently indicated that PECS was a component of his communication repertoire. (SRO Decision at 20.)

■■■ First, as noted by the SRO, the hearing record indicates that the CSE was aware that T.Y. utilized PECS as a part of his communication program, and that he did so through the use of a communications book, (Tr. at 105; SRO Decision at 20.) Accordingly, the IEP's first page identifies T.Y. as a "non-verbal child who communicates using a combination of gestures, signs, word approximations, and a communications book."[9] (IEP at 1.) As noted by the SRO, the IEP also contains an annual goal, namely that T.Y. will "improve his engagement/pragmatic language skills to increase his ability to participate in a continuous flow of communication," and references use of a communications book in the corresponding short-term objective. (IEP at 9; SRO Decision at 20.) As such, the court is not convinced that the absence of assistive technology was either in error or material.

■■■ The parents further argue that the IEP did not contain the requisite level of detail in its description of T.Y.'s level of communicative functioning. (Pls.' Mem. at 20; see also Pls.' Reply at 6.) Specifically, they object to its failure to identify "what gestures, signs and approximations he knows/uses" and "what picture symbols T.Y. understands and can functionally use." (Id.) They assert that the omission of such information would deprive a hypothetical new teacher of "the critical infor-

mation they would require" to communicate with T.Y. (Id.)

An IEP must contain "a statement of the child's levels of academic achievement and functional performance," as well as "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A). As an initial matter, the parents cite no case law or statutory provision that supports their position that further depth of descriptive information is required. Moreover, the SRO determined that the information contained in the IEP denoting T.Y.'s modes of communication was "[c]onsistent with the information before the CSE." (SRO Decision at 20.) The court agrees. (See June 2012 Progress Report at 1 (describing T.Y. as "a non-verbal child who communicates using a combination of gestures, signs, word approximations, and a communications book").)

### iii. Parent Training and Counseling

■■■ The parents contend that the IEP's failure to include provision for parent training and counseling either resulted in or contributed to the denial of a FAPE. (See Pls.' Mem. at 28; see also Pls.' Reply at 8–9.) "New York regulations require that an IEP provide for parent counseling and training for the parents of autistic children." R.E., 694 F.3d at 191 (citing N.Y. Comp. Codes R. & Regs. tit. 8 § 200.13(d)). Parent training and counseling means "assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow

---

dividual to give a picture of a desired item to a communicative partner, who then promptly provides the item as an exchange." (Def.'s Mem. at 21.)

**9.** The parents contend that the IEP should have indicated that these modes are T.Y.'s

*primary* modes of communication." (Pls.' Mem. at 20 (emphasis in original).) The court finds such an explicit statement unnecessary given what it sees as the plain meaning of this description.

them to support the implementation of their child's individualized education program." N.Y. COMP. CODES R. & REGS. tit. 8 § 200.1(kk). The Second Circuit has made clear that, "[t]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient." R.E., 694 F.3d at 191. This is largely because school districts are required to provide counseling for parents of covered children regardless of whether such counseling is specified in the IEP. See id.; M.W., 725 F.3d at 142. The parents put forth no persuasive reason to disturb the SRO's determination that this failure does not warrant tuition reimbursement. (See SRO Decision at 25.)

iv. Transition Plan

■■■ The parents argue that the SRO erred in his finding that the IEP adequately addressed T.Y.'s transition-related needs. (See Pls.' Mem. at 28.) The SRO specifically found that the IDEA does not require a transition plan for a transfer to a new school. (SRO Decision at 26.) This is correct. See J.C. ex rel. C.C. v. New York City Dep't of Educ., No. 13 CV 3759, 2015 WL 14999389, at *17 (S.D.N.Y. Mar. 31, 2015); A.D. v. New York City Dep't of Educ., No. 12 CV 2673, 2013 WL 1155570, at *8–9 (S.D.N.Y. Mar. 19, 2013). The SRO also found that the IEP reflected adequate consideration of T.Y.'s needs relating to transitioning from one school day activity or environment to another. (SRO Decision at 26.) Thus, the IEP indicates that T.Y. "needs warnings for any change in plans or routine" (IEP at 1), makes provision for a 1:1 crisis management paraprofessional, and includes an annual goal relating to maintaining regulation "throughout the

school day throughout a variety of activities and environments." (Id. at 4). The parents provide no persuasive reason to disturb this finding.

b. Substantive Adequacy

■■■■ Unlike procedural violations, "[s]ubstantive inadequacy automatically entitles the parents to reimbursement." M.W., 725 F.3d at 143 (internal quotation marks and citation omitted). "When assessing whether an IEP satisfies the IDEA's mandates, 'a federal court must examine the record for any objective evidence that the student's IEP will afford more than trivial advancement and is likely to produce progress, not regression.'" P.K., 819 F.Supp.2d at 105 (quoting M.M. v. New York City Dep't of Educ., 583 F.Supp.2d 498, 507 (S.D.N.Y. 2008)).

> IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP. The Supreme Court, however, has specifically rejected the contention that the 'appropriate education' mandated by IDEA requires states to 'maximize the potential of handicapped children.'

Walczak, 142 F.3d at 130 (quoting Rowley, 458 U.S. at 197 n.21, 102 S.Ct. 3034). "What the statute guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents." Id. at 132 (internal quotation marks and citation omitted). As explained below, the court, mindful of its institutional role, but basing its report and recommendation on the weight of the evidence and the comparative thoroughness of the IHO's and the SRO's analyses, finds that a preponderance of the evidence supports the conclusion that the recommended program would not produce progress.[10]

---

10. In reaching this conclusion, I am unpersuaded by the parents' argument that a 6:1:1

classroom with a provision for a 1:1 crisis management paraprofessional would be insuf-

### i. Need for a Relationship–Based Program

The IEP does not include a reference to teaching method. The parents argue that, given T.Y.'s history in programs that utilized other instructional methodologies, "removing [him] from his current DIR–based program without any evidence that he would likely be successful in an alternative program is not 'reasonably calculated.'"[11] (Pls.' Reply at 7) (emphasis omitted). Because the CSE did not consider documents or participant input addressing T.Y.'s need for a relationship-based instructional model, and because the IHO thoroughly considered evidence as to this issue, which the SRO dismissed, I find the parents' claim, in conjunction with other deficiencies, persuasive.[12]

■■■ "Under the IDEA, a student who is entitled to 'special education' services should receive 'specially designed instruction,' which requires 'adapting, as appropriate to the [student's] needs ..., the content, methodology, or delivery of instruction.'" R.B. v. New York City Dep't of Educ., 589 Fed.Appx. 572, 576 (2d Cir. 2014) (summary order) (quoting 34 C.F.R. § 300.39(b)(3)). "Although courts should generally defer to the state administrative hearing officers concerning matters of methodology," deference is inappropriate where the SRO fails to consider "highly significant evidence in the record." M.H., 685 F.3d at 252; see also R.E., 694 F.3d at 194 (finding that where the materials before a CSE reflected a "clear consensus" that a specific instructional methodology was required, the failure to offer such instruction was a substantive violation).[13]

According to the mother, T.Y. received ABA–based instruction at age two-and-a-half, but this method was not effective.[14] (Tr. at 609.) Specifically, T.Y. "was memorizing everything and was not able to really understand what he was doing ...." (Id.) T.Y.'s ABA providers thus recommended that he try a different instructional model. (Id.) At age three, T.Y. entered a public school program that utilized the TEACCH methodology.[15] (Id. at 610; Social History.)

---

ficiently supportive. (See Pls.' Mem. at 16–19; Pls.' Reply at 6.) As the SRO reasonably determined, both the proposed classroom and T.Y.'s June 2012 Rebecca classroom possessed a 2:1 student to adult ratio, if the number of students to adults was reduced to its lowest terms (i.e. 6:1:1 + 1 compared to 8:1:2 + 1). (See SRO Decision at 23–27; June 2012 Progress Report (T.Y. "attends the Rebecca School in an 8:1:2 classroom, with the support of a 1:1 paraprofessional.").)

11. This claim contains procedural and substantive elements.

12. This finding is not based on the court's view of the relative merits of one methodological approach as compared to others. Rather, it is based on the evidence of record that establishes T.Y.'s unique need for a program that focuses on developing core relationships to enable meaningful educational progress.

13. But see A.D., 2013 WL 1155570, at *12 (finding that the IEP's failure to dictate a DIR methodology was not a substantive violation);

F.L. ex rel. F.L. v. New York City Dep't of Educ., No. 11 CV 5131, 2012 WL 4891748, at *9 (S.D.N.Y. Oct. 16, 2012) ("Plaintiffs do not point to any statutory or regulatory support establishing a requirement that their preferred teaching methodology be considered in the development of an IEP.").

14. ABA is an instructional model that "combines behavior management, systematic instruction, generalization and socialization to eliminate maladaptive behavior" and breaks down "complex behavior goals ... into simple elements which can be taught in repeated trials." (Schools.nyc.gov ABA Methodology Overview, accessed Feb. 7, 2011, Dkt. No. 28–25.)

15. TEACCH "[p]rovides physical structure, scheduling and organization to the classroom in order to minimize the negative impact of student weaknesses in communication, social skills, hypersensitivity to sensory input, distractibility, etc. while maximizing the positive impact of student strengths, including visual

The Social History Update, which was before the CSE, states that T.Y. "was not improving" in the public school program. (Social History at 2.) However, the mother testified that this document was not discussed or considered at the IEP meeting. (Tr. at 611.) She also testified that the TEACCH methodology "made him very upset. He would go into a corner and crawl up into a ball, and he just was not responsive to it." (Tr. at 610.)

At age six, the parents enrolled T.Y. at Rebecca. (Social History at 2.) The "overriding methodology" at Rebecca is DIR/Floor time.[16] (Tr. at 240–42.) According to the Social History Update, this methodology "turned [T.Y.] around." (Social History at 2.) The June 2012 Progress Report, upon which the CSE relied to develop goals and obtain information about T.Y.'s levels of functioning, provides a detailed description of his progress in a DIR/Floor time program. (See June 2012 Progress Report.)

The mother testified that she raised her concerns regarding teaching methods to address T.Y.'s individual needs at the IEP meeting, inquiring whether there were any available programs that utilized DIR. (Tr. at 617–18.) However, Dr. Czarnecki declared that teaching methodology would not be discussed at the IEP meeting. (Id.) Ms. Mucherino also told the CSE that the goals and evaluation of T.Y.'s progress set forth in the June 2012 Progress Report were based on a classroom that utilized the DIR model, but Dr. Czarnecki did not consider her concerns. (Id. at 520–21.)

At the impartial hearing, Ms. Mucherino testified that T.Y. needs to have Floor time and DIR as a component of his program because "[h]e is such a relationship based kid." (Tr. at 514.) Ms. McCourt, the Rebecca program director who did not participate in the CSE but was familiar with T.Y. since his 2006 enrollment at Rebecca, testified that T.Y. would not be an appropriate candidate for a behavioral instructional model. (Tr. at 382.) According to her,

> to have the behavioral methodology be successful across all areas, you need to be able to understand, be able to build that logical bridge that if I do this then this is going to happen whether it's good or bad, right? Whether it's going to be punished at the end or it's going to be rewarded, you need to be able to make those connections. And [T.Y.] is working on that but those connections are not clear to him.

(Id.)

Nonetheless, the SRO determined that there had been "no evidence of any information before the CSE that [T.Y.] could not receive educational benefit from educational methodologies other than the DIR model." (SRO Decision at 28–29.) Given the CSE's refusal to discuss teaching methods to address T.Y.'s individual needs, it is unclear what other form such evidence could take. The administrative record is clear that T.Y. did not respond well to

skills, memory and personal interests and preferences" and "[u]tilizes class and individual scheduling, verbal and visual prompts and 1–on–1 (teacher/ student) joint activity routines based on meaningful and enjoyable social situations as the platform for teaching work, communication, social and leisure skills." (Schools.nyc.gov TEACCH Methodology Overview, accessed Feb. 7, 2011, Dkt. No. 28–27.)

**16.** Unlike ABA and TEACCH, as the IHO found, DIR is "primarily a *relationship* based methodology focusing on neurodevelopmental delays in relating and communicating, where delays create core deficits in these areas and other areas such as sensory integration, fine and gross motor control and the ability to focus, attend and learn." (IHO Decision at 14 n.7 (emphasis added).)

ABA or TEACCH methods in the classroom and that he was poorly suited for behavioral instructional programs. It was only when offered a relationship-based model, DIR, that T.Y. began to respond.

The SRO found that DIR was not required because "[a]lthough testimony from the parent indicates that the student had not made progress using TEACCH and ABA approaches, the student has not received instruction in either since before he first began attending the Rebecca School in 2006." (Id. at 28.) This contention, however, is not supported by any evidence indicating that T.Y. would respond differently in 2012 than he did in 2006. The SRO also discounted Ms. Mucherino's testimony on the ground that "she did not remember the subject of methodology being raised at the CSE meeting." (Id.) In context, however, it is evident from Ms. Mucherino's testimony that she informed Dr. Czarnecki of her concerns but he was not responsive. (See Tr. at 520–21, 523.)

 While recognizing its limited expertise, the court has independently reviewed the record and finds that the SRO's analysis insufficiently accounts for the CSE's failure to receive and consider relevant information from both T.Y.'s family and professionals who had worked closely with him about T.Y.'s individual needs and effective instructional methods. Cf. M.H., 685 F.3d at 252 ("the SRO's failure to consider any of the evidence regarding the ABA methodology and its propriety for [the student] is more than an error in the analysis of proper educational methodology. It is a failure to consider highly significant evidence in the record."). As a result, the IHO found, and the court agrees, that the IEP does not sufficiently address T.Y.'s unique needs. Accordingly, the court defers to the IHO's thoughtful and well-reasoned determination that "the team did not consider the DIR/ Floor time methodology or even supports contained within the methodology" and that the IEP "fails to provide for a program, supports or resources that address the student's demonstrated need for a relationship based program." [17] (IHO Decision at 14, 21.)

### ii. Speech–Language Therapy

The CSE's failure to consider T.Y.'s need for a relationship-based program is compounded by its treatment of speech-language therapy. In June 2012, T.Y. was receiving in-school speech-language therapy at Rebecca three times per week 1:1, and one time per week 4:1. All sessions lasted thirty minutes. (June 2012 Progress Report at 3.) During the same period, T.Y. received after-school speech-language therapy from a related service provider, Emilia's Kids, five times per week 1:1 for sixty-minute sessions. (See Emilia's Kids Progress Report.) Thus, in total, at the time of the CSE meeting, T.Y. was receiving seven weekly hours of speech-language therapy.

The Emilia's Kids Progress Report states that T.Y. "requires 5 hourly sessions [of speech-language therapy per week] in order to provide as many opportunities to practice learned skills to generalize into natural environments as well as

---

**17.** I note, however, that "the IEP must be evaluated prospectively as of the time of its drafting," RE., 694 F.3d at 186–87, and that courts have found that "a substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE," D.A.B. v. New York City Dep't of Educ., 973 F.Supp.2d 344, 361 (S.D.N.Y. 2013). The court therefore has not considered those portions of the IHO's decision that rely on the testimony of T.Y.'s 2012–13 teachers and therapists. (See IHO Decision at 13–14.)

to minimize the occurrence of regression." (Emilia's Kids Progress Report at 4.) The mother testified that she sent this report to the DOE prior to the CSE meeting and that she also brought a copy of the report with her to the meeting. (Tr. at 612.) According to her, she brought up the report at the meeting, but Dr. Czarnecki did not want to read it, placed it in the middle of the table, and made no reference to it. (Tr. at 615–16.) Similarly, Ms. Mucherino testified that the mother requested a continuation of the student's outside speech-language therapy and that Dr. Czarnecki responded by stating that the CSE meeting would only address those services which were to be part of the school day, not after-school services. (Id. at 527.)

At the impartial hearing, Ms. Musheyeva, T.Y.'s Emilia's Kids speech-language pathologist, testified that T.Y, required supplemental after-school sessions because he "presents with a multifaceted nature of disabilities. He has severe apraxia comorbid with autism, presents with sensory deficits, motor planning impairment, oral motor dysfunction, dysarthria as characterized by his drooling, [and] very weak musculature." (Tr. at 555–56.) She testified that T.Y. "needs as many opportunities as possible to be able to practice oral motor techniques, practice combining vowels together to be able to learn motoric sequences of sound combination. And to do that—motor pathways are formed through repetitious drills. And to be able to do that, he needs to be able to practice them on a daily basis in a very structured setting." (Id.)

The IEP recommends three forty-minute 1:1 speech-language therapy sessions, and one forty-minute 2:1 session per week. (IEP at 11–12.) In other words, T.Y.'s weekly speech therapy program was to have been reduced from seven hours to two hours and forty minutes during the 2012–13 school year.

The SRO found that "while the student likely benefited from [after-school] speech-language therapy, it does not appear that he required [it] in order to receive a FAPE." (SRO Decision at 27.) In reaching this conclusion, he appears to have focused primarily on the other related services, namely occupational therapy, physical therapy, and counseling, that were recommended for T. Y., and reasoned that these together "represent[ ] a substantial commitment to the student's needs in these areas." (Id.) This reasoning, however, is not persuasive. Plainly, IEP recommendations addressing a demonstrated need in one area do not necessarily rectify a deficiency in a different area. The SRO's decision fails to explain how counseling, physical therapy, or occupational therapy addresses T.Y.'s demonstrated need for intensive speech therapy.

The SRO's decision further attempts to justify this drastic reduction in speech-language therapy by citing to case law, predominantly from other circuits, holding that "the IDEA does not require school districts as a matter of course, to design educational programs to address a student's difficulties in generalizing skills to other settings outside the classroom." (SRO decision at 26.) However, the decision fails to recognize the importance of speech therapy in improving T.Y.'s communication skills in all settings, including in the classroom. Whether such therapy is provided during or after the school day or in the classroom or another setting is of little moment, as the record reflects that the reduced speech services provided in the IEP are insufficient to meet T.Y.'s needs and may well cause him to regress. See Walczak, 142 F.3d at 130 ("An appropriate public education under the IDEA is one that is likely to produce progress, not

regression.") (internal quotation marks and citation removed). As noted above, the Emilia's Kid's Report explicitly warns that its recommendations are necessary "to minimize the occurrence of regression." (Emilia's Kids Report.) The SRO points to no evidence in the record that contradicts that assessment. Cf. P.K., 819 F.Supp.2d at 111 (finding an IEP substantively inadequate where, inter alia, the student had been receiving speech therapy in 1:1 sessions 3x30 per week, but the IEP provided for speech therapy in 3:1 sessions 3x30, and eliminated ten hours per week of 1:1 home-based ABA therapy).

 Under these circumstances, the court defers to the IHO's well-reasoned determination that additional speech-language therapy was necessary for T.Y. to make progress in his educational program. (IHO Decision at 17–18, 21.) Accordingly, because the IEP failed to meet T.Y.'s need for a relationship-based instructional program or to provide sufficient speech-language therapy to address T.Y.'s need for intensive communication training, I find that the IEP was not "reasonably calculated to enable [T.Y.] to receive educational benefits," Rowley, 458 U.S. at 207, 102 S.Ct. 3034, and was not "tailored" to his "unique needs," id. at 181, 102 S.Ct. 3034.[18] I therefore turn my attention to prongs two and three of the Burlington–Carter test.

### 2. Prong Two of the Burlington–Carter Test

 "The second prong of the Burlington–Carter test asks whether 'the program selected by the parent was appropriate, such that the private program meets the student's special education needs.'" P.K., 819 F.Supp.2d at 115 (quoting M.P.G.,

2010 WL 3398256, at *2). "The parents bear the burden of establishing that the placement selected was an appropriate one." Id. (citing Gagliardo, 489 F.3d at 112).

> The standards for determining whether a private school placement is 'appropriate' under the IDEA closely resemble, but do not mirror, the standards for assessing the adequacy and appropriateness of the proposed public placement. The Second Circuit has explained that '[s]ubject to certain limited exceptions, the same considerations and criteria that apply in determining whether the school placement is appropriate should be considered in determining the appropriateness of the parents' placement.' Gagliardo, 489 F.3d at 112 (citation omitted). 'The issue turns on whether a placement—public or private—is reasonably calculated to enable the child to receive educational benefits.' Id. (citation omitted).... Ultimately, the standard to be applied is to determine whether '[the] unilateral private placement ... provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child." Gagliardo, 489 F.3d at 115 (citation omitted)

A.D. v. Bd. of Educ. of City Sch. Dist. of City of New York, 690 F.Supp.2d 193, 206 (S.D.N.Y. 2010) (first ellipses added).

Having determined that the DOE offered T.Y. a FAPE, the SRO did not reach the second prong of the Burlington–Carter test. Because she determined that the DOE failed to offer T.Y. a FAPE, however, the IHO reached the second prong of the test and found that the parents' placement was appropriate to meet T.Y.'s educational needs during the 2012–13 school

---

**18.** Given this determination, I need not address the parents' remaining argument that the IEP could not be properly implemented at the proposed placement. (See Pl.'s Mem. at 26–28.)

year. (See IHO Decision at 23–26.) In reaching this decision, the IHO relied on the testimony of Ms. McCourt, the Rebecca program director, and Ms. Saunders, the teacher during the 2012–13 school year. (Id. at 24–26.) Specifically, the IHO focused on, inter alia: the Rebecca classroom ratio and the ages of other students therein; the "transdisciplinary" team composed of a physical therapist, speech-language pathologist, music therapist, and classroom staff available to address T.Y.'s deficit areas; the DIR methodology and the training Rebecca staff receive, as well as weekly review of T.Y.'s program; the number of weekly instructional hours provided and the academic curriculum; the development and implementation of goals and objectives; provision of parent training and support; the qualifications of the teachers and teaching assistants; the benefit T.Y. receives from Floor time; the benefit T.Y. receives from a sensory diet and an oral motor protocol; the collaboration between the head teacher and related service providers; and the benefit T.Y. receives from a DIR–based program and his progress academically, socially, and behaviorally. (Id.)

▆▆ The DOE argues that the IHO erred in her determination and that her decision is not entitled to deference. (Def.'s Mem. at 34–35.) It contends that Rebecca was an inappropriate placement because: (1) it did not provide a 1:1 paraprofessional to address T.Y.'s behavioral needs; and (2) it did not provide sufficient speech and language support. (Id. at 35.) While a 1:1 paraprofessional had been provided for T.Y. at Rebecca by the DOE, it argues that "Plaintiffs and the Rebecca School chose to rely on the DOE for a required service that they should have provided." (Id.) Similarly, although T.Y. was receiving 5x60 weekly speech-language therapy after-school from Emilia's Kids, the DOE

argues that the speech-language therapy provided at Rebecca (4x30) was not independently sufficient. (Id.) Thus, the DOE asks the court to segregate a component of T.Y.'s 2012–13 unilateral program, namely attendance at Rebecca, and not to consider other components of the program: five hours per week of 1:1 home and community-based speech-language therapy and provision for a 1:1 crisis management paraprofessional. The court does not agree with this position under the circumstances of this case. See M.H., 685 F.3d at 254 (while "it is appropriate for the hearing officer and the Court to take into consideration the fact that the parents obtained necessary services not offered through the selected school from an outside agency . . . it is not necessarily dispositive . . . . [and] the absence of related services at [the unilateral placement] does not *require* a finding that [it] was inappropriate.") (emphasis in original). Here, the parents requested funding for a unilateral program that included both in-school (4x30) and after-school (5x60) speech-language therapy, and included both behavioral supports provided by Rebecca and provision for a 1:1 crisis management paraprofessional to supplement those supports. In sum, I find the DOE's arguments as to prong two unpersuasive. Having reviewed the voluminous hearing record as to this issue, as well as the IHO's thorough and well-reasoned prong two determination, I find that her decision is supported by a preponderance of the evidence, and that Rebecca was an appropriate unilateral placement for T.Y.

### 3. Prong Three of the Burlington–Carter Test

▆▆ "The third and final prong of the Burlington–Carter test provides that any reimbursement may be reduced or denied upon a finding of unreasonableness with respect to actions taken by the par-

ents." P.K., 819 F.Supp.2d at 116–17 (internal quotation marks and citation omitted); see 20 U.S.C. § 1412(a)(10)(C)(iii). Here, the SRO did not reach the third prong of the Burlington–Carter test. The IHO found that the record lacked any evidence that the parents did not fully cooperate with the CSE. (IHO Decision at 27.) She further found that the parents: attended the CSE meeting; shared reports with the DOE; visited the recommended placement; and timely notified the DOE at the CSE meeting and subsequent to visiting the DOE proposed placement of their disagreement with the proposed program and placement and intent to unilaterally enroll their son at Rebecca. (Id.) The DOE does not argue that the IHO erred in this respect, and the court, having examined the evidentiary record, finds no reason to depart from her reasoned conclusion.

### CONCLUSION

For the reasons stated above, I find that the DOE failed to offer T.Y. a FAPE, that the parents' unilateral program was an appropriate placement for T.Y., and that the equities weigh in favor of a full tuition award. I therefore respectfully recommend that plaintiffs' motion for summary judgment be granted and that defendant's cross-motion be denied. In addition, I recommend that plaintiffs' counsel be granted leave to submit an application for attorney's fees and costs within thirty days of the date of judgment.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Matsumoto and to my chambers, within fourteen (14) days. Failure to file objections within the specified time waives the right to appeal the district court's order.

See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).